## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

JOHN KEITH CALVIN,                    )
                                      )
               Plaintiff,          )
                                      )
v.                                    )          Case No. 22-3317-JWL-JPO
                                      )
STATE OF KANSAS, et al.               )
                                      )
               Defendants.         )
_____ )

## STATE OF KANSAS'S RESPONSE TO PLAINTIFF'S
## REQUEST FOR EMERGENCY INJUNCTIVE RELIEF

      The State of Kansas opposes plaintiff's request for emergency injunctive relief.

Plaintiff is requesting a preliminary injunction to compel KDOC to:

      1)      provide immediate intravenous nourishment;

      2)      transfer plaintiff's care to an unnamed hospital or hospice facility in the Kansas City area capable of handling plaintiff's medical needs;

      3)      notify plaintiff's attorneys of Calvin's location; and

      4)      make plaintiff available for a second deposition although plaintiff already testified by deposition to preserve his testimony 13 days ago.

      First, Centurion is contracted by the State of Kansas to provide medical care to all inmates.  Pursuant to Fed. R. Civ. P. 19, Centurion is a necessary party to defend against plaintiff's allegations of subpar medical treatment.  Any action in this case should be

stayed until Centurion has been made a party and afforded the opportunity to respond to plaintiff's claims.

Next, a preliminary injunction is an extraordinary remedy, and even more so when the injunction would alter the status quo. Plaintiff has not provided evidence to show that KDOC and Centurion have been deliberately indifferent to his medical condition. In fact, the evidence offered by defendants shows plaintiff has at least had adequate care. Further, plaintiff cannot prevail on his underlying claims because he failed to exhaust his administrative remedies. Plaintiff has also not shown that he has had constitutionally inadequate access to the courts, counsel, and his family.

The parties should also not be subject to the time and expense of plaintiff essentially wanting a "do over" to have his deposition taken again. Plaintiff and his counsel had ample opportunity during plaintiff's deposition 13 days ago to obtain testimony regarding plaintiff's medical care and the circumstances of his underlying criminal case.

For these reasons, plaintiff's request for an emergency preliminary injunction should be denied.

### Statement of Facts

1.      Plaintiff John Calvin ("Calvin") is a resident of the Kansas Department of Corrections. ("KDOC"). (Doc. 1, ¶ 2)

2.      Calvin is serving a life sentence on state court felony convictions for felony first-degree murder and attempted robbery.  (Doc. 1, ¶ 2, footnote 1, p. 1-2) See also *State v. Calvin*, 279 Kan. 193 (2005) (affirming life sentence).

3.      Calvin has not filed a grievance appeal with the Secretary of Corrections regarding access to counsel, recent medical care, or familial association. Declaration of Darcie Holthaus, ¶ 5.  A copy of Darcie Holthaus's Declaration is attached as "Exhibit A."

### Facts regarding Calvin's Medical Care

4.      Dr. Paige Dodson, M.D., is the Statewide Medical Director for Centurion of Kansas, LLC ("Centurion").  As Statewide Medical Director, her job duties include reviewing and management of the medical care provided by physicians and other medical personnel in KDOC facilities across the state of Kansas.  Affidavit of Dr. Paige Dodson, M.D., ¶ 5.  The Affidavit of Dr. Dodson is attached as "Exhibit B."

5.      Dr. Dodson is familiar with the medical records of Calvin as maintained by Centurion.  (Exhibit B, ¶ 3)

6.      Centurion provides contractually-specified medical care at correctional facilities in Kansas. Generally, medical care is provided at the facility where an individual is incarcerated. If the facility does not have the ability to provide certain care, Centurion coordinates the provision of that care through local medical providers. (Exhibit B, ¶ 6)

7.      Palliative care, comfort care, supportive care and hospice care are all available to Centurion's patients.  Centurion has considerable experience in these modalities as the mission of the El Dorado Correctional Facility ("EDCF") includes cancer care.  Patients transfer from all over the State of Kansas to receive chemotherapy at the infirmary at EDCF, due to the experience of our clinicians there, and the proximity to our partner cancer treatment center.  Patients receive cancer treatment including chemotherapy, surgical treatment, and/or radiation as directed by community physicians.  Dr. Dodson and Centurion are active in co-management of these patients and transition to end-of-life care, if needed.  This includes management of pain, nutrition, nausea, constipation and many other possible symptoms.  In addition, we coordinate with KDOC to provide for spiritual and family support.  (Exhibit B, ¶ 7)

8.      According to his medical records, in 2017 Mr. Calvin was diagnosed with colon cancer and was treated with neoadjuvant chemotherapy and radiation in 2018. His cancer went into remission at that time. He was advised to pursue surgical resection of his colon as well, but he anticipated potential reversal of his conviction and so chose not to proceed with that procedure at that time.  (Exhibit B, ¶ 8)

9.      Following the initial treatment of his cancer, Mr. Calvin was followed by Dr. Dakhil, an oncologist, as well as through clinical visits at EDCF. Regular PET scans were conducted to detect any return of his cancer. In fall of 2022, around September, Mr. Calvin became jaundiced. His liver enzymes increased significantly as did his

bilirubin. He lost about 20 pounds over approximately six weeks. This presented a concern that his cancer may have returned, and a work-up was initiated.  (Exhibit B, ¶ 9)

10.     On November 23, 2022, Mr. Calvin's condition worsened. He experienced nausea, vomiting, and hematuria. Mr. Calvin was transferred to the hospital for further evaluation.  (Exhibit B, ¶ 10)

11.     The hospital conducted an exploratory laparotomy procedure on December 13, 2022, which found that his abdominal cavity contained tumors that had eroded into the prostate and bladder. Bilateral nephrostomy tubes were placed. Mr. Calvin was declared by the hospital to require hospice care, and he was kept comfortable. Mr. Calvin was returned to EDCF and admitted to the infirmary as a hospice patient on December 16, 2022.  (Exhibit B, ¶ 11)

12.     Since he returned to EDCF, Mr. Calvin's medical needs have been thoroughly and regularly assessed. Mr. Calvin is lucid, and able to contact medical staff, who are available 24/7, at any time.  (Exhibit B, ¶ 12)

13.     Centurion staff are managing Mr. Calvin's pain through medication. He has been prescribed 4mg Dilaudid every 4-6 hours as needed and morphine 8-12 mg intravenously every 4-6 hours as needed. Because he is in the infirmary, nurses round on him approximately every two hours. Records reflect that Mr. Calvin had previously not requested any adjustments to his pain medication regimen until it was last adjusted

today, January 4, 2023. This morning, Dr. Dodson approved an increase to Mr. Calvin's prescription to morphine 10-15 mg IV or IM every 4-6 hours.  (Exhibit B, ⁋ 13)

14.     Mr. Calvin's current pain medication dosing regimen is significant. Higher dosages would likely cause constipation, urinary retention, sedation, or even hallucinations.  Mr. Calvin is already experiencing abdominal distention due to slow colonic transit as a likely result of the pain medications. Mr. Calvin's pain is managed as well as can be expected given his metastatic cancer, and is managed appropriately for his goals of care.  (Exhibit B, ⁋ 14)

15.     Although Mr. Calvin has lost some weight, he has not lost 70 pounds since September of 2022. Mr. Calvin's historical steady weight has been around 170 pounds. On August 31, 2022, Mr. Calvin weighed 160 pounds. On November 14, 2022, he weighed 154 pounds. As of January 3, 2023, he weighs 129.1 pounds.  (Exhibit B, ⁋ 15)

16.     Mr. Calvin is able to consume food, pass gas, and have bowel movements. This indicates that his digestive tract is working. He has an unrestricted diet and may eat anything that is available at the facility. He is able to have additional nutritional shakes (Ensure) three times a day. His oral intake has been improving.  (Exhibit B, ⁋ 16)

17.     Because Mr. Calvin's digestive system is operative, delivery of nutrients via Total Parenteral Nutrition ("TPN") is not medically indicated in Mr. Calvin's case. TPN does not reverse weight loss, rather it is designed to prevent further deterioration. It is generally reserved for situations where a patient is unable to take food orally.

Physicians at the hospital have not recommended TPN in Mr. Calvin's two admissions. (Exhibit B, ⁋ 17)

18.     TPN also carries serious risks including infection.  TPN is typically delivered via a central venous catheter. This type of catheter must be surgically placed in close proximity to the heart. TPN consists of nutrients—sugars, proteins, fats, etc.— that are food for bacteria just as much as for human beings. This creates a high risk of infection. At least ten percent of the time that nutrition is delivered via TPN, a serious infection results. When TPN is used long-term, rather than short term during hospitalization as it is intended, the rate of infection increases.  An infection of this type could be fatal for an immunocompromised individual such as Mr. Calvin.  (Exhibit B, ⁋ 18)

### Facts regarding Access to Family and Counsel

19.     Calvin is currently housed in the infirmary at the EDCF.  Declaration of Kirbie Todd Shearburn, ⁋ 3.  The Declaration of Kirbie Shearburn is attached as "Exhibit C."

20.     Ms. Shearburn is familiar with Mr. Calvin and his current health conditions.  Ms. Shearburn is the designated person who interacts with families when residents pass away or go off-site for emergent medical care.  (Exhibit C, ⁋ 3)

21.     Ms. Shearburn also oversees the hospice program.  Ms. Shearburn has almost exclusively been handling Calvin's requests for communications.  (Exhibit C,

¶ 3)

22.     During his November and December stays at Wesley Hospital, Calvin

was allowed to make calls to family upon request.  (Exhibit C, ¶ 4)

23.     While in the hospital, Calvin was allowed to make legal calls upon his

own request, and upon the request of counsel.  (Exhibit C, ¶¶ 4, 8, 11)

24.     Since December 7, 2022, Calvin has spoken by phone to family on

numerous occasions:[1]

       a.     December 7 (11 minutes);

       b.     December 8 (55 minutes);

       c.     December 9 (100 minutes);

       d.     December 10 (20 minutes);

       e.     December 11 (55 minutes);

       f.     December 12 (82 minutes);

       g.     December 13 (6 minutes);

       h.     December 14 (28 minutes);

       i.     December 15 (20 minutes);

       j.     December 25 (40 minutes);

---

[1] Calvin's contact with family is extensive, extending well beyond the dates and times listed. For brevity, Defendants attach only the portion relevant to the time period alleged in the Complaint. Comprehensive call logs can be provided upon request.

k.      December 26 (three calls made totaling 6 minutes);

l.      December 27, 2022 (20 minutes);

m.      December 29, 2022 (43 minutes);

n.      January 1, 2023 (five calls - 13 minutes, 2 minutes, 3 minutes, 7

minutes, 6 minutes);

o.      January 3, 2023 (3 minutes).

(Exhibit C, ¶ 5)

25.    Since December 1, 2022, Calvin has had in person visits with family

twice.  Two more visits were offered but declined by his family.  Two visits were

scheduled, but cancelled, when Calvin was transferred to Wesley Medical Center.

(Exhibit C, ¶ 6)

26.    During Calvin's first hospital stay, his counsel requested calls on

December 12, December 14, and December 16, 2022. The December 12th and

December 16th calls were approved and occurred. The December 14th call was

denied as Calvin was due to be transported back to EDCF and could make a legal

call from the facility. (Exhibit C, ¶ 8)

27.    On December 14, 2022, when denying the legal call from the hospital

due to transporting Calvin back to the facility, Calvin's counsel was advised that she

could speak to him in the morning once he returned to the facility and was also

offered an in person visit, to which she never responded.  (Exhibit C, ¶ 9)

- 9 -

28.     During Calvin's second hospital stay, he was approved for legal calls but never requested one.  Nor was a request received from his counsel. Instead, Mr. Calvin informed staff that he was only requesting calls with his wife and was not requesting legal calls because "they stress [him] out."  (Exhibit C, ⁋ 10)

29.     Since his return to the facility, counsel has requested calls on the following dates:

a.      December 20, 2022 (43 minutes in length);

b.      December 21, 2022 (three calls – 3 minutes, 13 minutes, and 17 minutes);

c.      December 23, 2022 (call arranged but Calvin taken to hospital before completion);

d.      January 3, 2023 (30 minutes in length).

(Exhibit C, ⁋ 11)

30.     Mr. Calvin requested a legal call on December 29, 2022 (43 minutes in length) and attempted to place three legal calls to counsel on January 1, 2023 but received no answer.  (Exhibit C, ⁋11)

31.     Since at least November 1, 2022, Calvin's counsel has made no requests for in person legal visits, even when offered.  (Exhibit C, ⁋ 12)

32.     Calvin has not received confidential legal mail since November 29, 2022.  (Exhibit C, ⁋ 12)

*Facts regarding Disclosure of Location*

33.     Joel Hrabe is employed by the KDOC as the Deputy Secretary of

Facility Management.  Declaration of Joel Hrabe, ⁋ 1.  The Declaration of Joel Hrabe

is attached as "Exhibit D."

34.     Mr. Hrabe is familiar with the procedures for managing and housing

special needs residents, including residents sent outside the facility for medical care.

(Exhibit D, ⁋ 2)

35.     Security considerations for out of facility transports, to include medical

appointments or hospitalizations, require the KDOC to conduct a security

assessment reviewing information such as the resident's current crime of conviction

and sentence, past criminal history to include previous escape(s), history of violence,

history of disruption, and or history of influence causing violence or disruption, the

high profile nature of the current offense, the residents institutional adjustment to

include disciplinary reports, security threat group affiliation or any other specialized

skills or issues associated with the resident.  (Exhibit D, ⁋ 3)

36.     Other related factors may include the resident's behavioral health

status, members of the public imposing influence to include threats or coercion on

facility staff or medical personnel, and or anticipation of unauthorized visitors at the

location of the resident.  (Exhibit D, ⁋ 3)

37.     Further, the warden may incorporate appropriate provisions when a resident is hospitalized and impose such security procedures as are determined to be appropriate based on the offender's individual circumstances. Such security procedures may include, restrictions on visitation or denial of visitation during the period of hospitalization, restrictions on telephone calls or denial of telephone calls during the period of hospitalization, restrictions on notifications to the offender's family regarding the location of the hospitalization, requests that the hospital not release any information regarding the offender including the offender's presence as a patient at the hospital, and if necessary increase in the number of corrections officers providing security at the hospital.  (Exhibit D, ⁋ 4)

38.     Such limitations, when imposed, serve to preserve a safe environment for the health care workers, resident, and KDOC staff.  In addition, outside influence involving the medical care and treatment of residents through threat of litigation, high pressure through excessive calls or communications by family, and or similar acts to providers impedes treatment of the resident and often hinders future viability of continued health care with those providers or health care entity.  (Exhibit D, ⁋ 5)

39.     Given the high-profile nature of Mr. Calvin's conviction, and the issues caused by what appear to have been threats made to outside medical providers, disclosing Mr. Calvin's location when outside the secure perimeter of the correctional facility has been determined by the Department to be a security risk.

Prior interactions by Mr. Calvin's family and/or agents impeded the ability of the

Department to timely and efficiently receive information regarding the resident and

threatened the future viability of continued health care with those providers.

(Exhibit D, ¶ 6)

### Facts regarding Calvin's December 22, 2022 Deposition

40.     On December 16, 2022, plaintiff filed an Emergency Petition Seeking

Perpetuation of Testimony in Johnson County, Kansas pursuant to K.S.A. 60-227 to

preserve plaintiff's testimony by deposition.  (Complaint, footnote 2, p. 2)

41.     The deposition took place on December 22, 2022 at the El Dorado

Correctional Facility.  A copy of the deposition transcript is attached as "Exhibit E."

42.     Calvin was questioned extensively by his counsel about his medical

care, up to and including medical care provided on December 22, 2022.  (Exhibit E,

13:24-56:7)

43.     Calvin was also questioned extensively regarding his underlying

criminal case that resulted in his incarceration and his claims of innocence.  (Exhibit

E, 56:8-82:10)

44.     On December 30, 2022, plaintiff filed this current lawsuit.

### Argument and Authorities

**I.     Standards for the Issuance of a Preliminary Injunction.**

To be entitled to the entry of a preliminary injunction pursuant to Fed. R. Civ. P. 65, the moving party must show:

> (1) [he or she] will suffer irreparable injury unless the injunction issues; (2) the threatened injury ... outweighs whatever damage the proposed injunction may cause the opposing party; (3) the injunction, if issued, would not be adverse to the public interest; and (4) there is a substantial likelihood [of success] on the merits.

*Schrier v. Univ. Of Co.*, 427 F.3d 1253, 1258 (10th Cir. 2005) (citations omitted) "As a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal." *Id.*

Because the purpose of a preliminary injunction "is merely to preserve the relative positions of the parties until a trial on the merits can be held," [citation omitted] there are three types of preliminary injunctions that are specifically disfavored:  "(1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits." *Schreier*, 427 F.3d at 1258–59.  Such disfavored injunctions "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft,* 389 F.3d 973, 975 (10th Cir. 2004).

Here, one of Calvin's claims for relief is to be transferred to an unnamed medical facility in the Kansas City area.  (Doc. 1, ¶ 24, p. 6)  The status quo is the last

uncontested status between the parties which preceded the controversy. *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1155 (10th Cir.2001) (citation omitted). Here, the status quo is Calvin's treatment at EDCF in the oncology department and treatment at outside hospitals in the Wichita area if emergent care is needed. Plaintiff's request to be transferred to an unnamed Kansas City facility alters the status quo. The Court must more closely scrutinize plaintiff's requested remedy – which is extraordinary already.

Further, Calvin is requesting a mandatory preliminary injunction. In addition to asking to be transferred to another facility, Calvin is requesting a nonspecific change in his medication and nourishment. An injunction is mandatory if the requested relief "affirmatively require[s] the nonmovant to act in a particular way, and as a result ... place [s] the issuing court in a position where it may have to provide ongoing supervision to assure the nonmovant is abiding by the injunction." *Schrier v. Univ. Of Co.*, 427 F.3d 1253, 1261 (10th Cir. 2005). Here, the requested relief requires Centurion and KDOC to act and places the Court in a position of ongoing supervision.

A party seeking a change in the status quo through a mandatory preliminary injunction "must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms, and may not rely on our modified likelihood-of-success-on-the-merits standard." *Schrier*, 427 F.3d at 1261.

II.     <u>**Centurion is a Necessary Party Requiring Joinder.**</u>

Centurion provides contractually-specified medical care at correctional facilities in Kansas.  Generally, medical care is provided at the facility where an individual is incarcerated. If the facility does not have the ability to provide certain care, Centurion coordinates the provision of that care through local medical providers.  Centurion has a contract with KDOC to provide medical care for all inmates, including Calvin, at its correctional facilities.  Medical decisions and standard of care are by provided by Centurion in conjunction with the patient.

Fed. R. Civ. P. 19(a) states that a party whose joinder will not deprive the court of subject-matter jurisdiction must be joined if (A) in that party's absence, the court cannot accord complete relief among existing parties; or (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest. A necessary person must be joined as a party if joinder is feasible.  *Davis ex rel. Davis v. United States*, 343 F.3d 1282, 1289 (10th Cir. 2003).

In the case at bar, Calvin is making allegations related to his medical care by Centurion.  By contract, Centurion provides medical treatment to Calvin.  The absence of Centurion from this action prevents the Court from according complete relief among

- 16 -

existing parties.  KDOC defers to Centurion on the provision of medical treatment.

Disposing of the action without Centurion's participation may impair or impede

Centurion's ability to protect its own interest.  Therefore, Centurion must be joined as a

necessary party to be allowed to defend itself against Calvin's medical claims.  Any

action in this case should be stayed until Centurion is made a party.

**III.**     <u>**Calvin Cannot Show a Substantial Likelihood of Success on the Merits**</u>**.**

Keeping in mind that Calvin must make a strong showing of a substantial

likelihood of success on the merits, Calvin cannot do so for three reasons.  First, Calvin

has not shown a substantial likelihood of success on his claim that defendants and

Centurion have engaged conduct that amounts to deliberate indifference to Calvin's

medical needs.  Second, Calvin has not exhausted the administrative remedies available

to him.  Finally, Calvin has not shown that his access to the courts, counsel, or family is

constitutionally deficient.

       **A.**     <u>**Calvin cannot show a deliberate indifference to his medical needs**</u>**.**

"A prison official's 'deliberate indifference' to a substantial risk of serious harm

to an inmate violates the Eighth Amendment."  *Farmer v. Brennan*, 511 U.S. 825, 828

(1994).  "Failure to provide adequate medical care is a violation of the Eighth

Amendment if it is a result of deliberate indifference to a prisoner's serious medical

needs." *Garcia v. Salt Lake Cty.*, 768 F.2d 303, 307 (10th Cir. 1985) (citation omitted).

"'Deliberate indifference' involves both an objective and a subjective component. The

objective component is met if the deprivation is 'sufficiently serious.'"  *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000).  As to the subjective component, a plaintiff must prove that a prison official "knows of and disregards an excessive risk to inmate health or safety."  *Id.* (citation omitted)

> Prisoners do not have a constitutional right to a particular course of medical treatment, and an inmate's disagreement with a prison official's decisions regarding his medical care fails to satisfy the subjective element of a deliberate indifference claim. *See Callahan v. Poppell*, 471 F.3d 1155, 1160 (10th Cir. 2006). The law is clear that even medical malpractice does not rise to the level required for a cognizable Eighth Amendment claim. *See, e.g., Estelle*, 429 U.S. at 106 (medical negligence does not violate the Eighth Amendment). In other words, a prison doctor does not violate the Eighth Amendment's prohibition on cruel and unusual punishment when he "merely exercises his considered medical judgment." *Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006).

*Weeks v. Barkman*, No. 20-CV-00544-PAB-NYW, 2021 WL 4555999, at *6–7 (D. Colo. Mar. 22, 2021), report and recommendation adopted, No. 20-CV-00544-PAB-NYW, 2021 WL 4146001 (D. Colo. Sept. 13, 2021).

In this action, Calvin alleges that "the evidence shows" that KDOC refused to provide adequate pain management and nourishment.  (Doc. 1, ¶ 25)  Calvin also alludes to "recommendations from his physicians."  *Id.*  However, Calvin has not offered what those recommendations are, his physicians' identities making the recommendations, or any medical records or evidence that support this allegation.

On the other hand, defendants have included affidavits from Calvin's actual medical providers who have first-hand knowledge of Calvin's care.  In particular, Dr.

Dodson has provided a detailed account of Calvin's medical care that he has received from Centurion and outside hospitals when necessary. Dr. Dodson explains why Calvin's medication dosage is a balancing act, and that the addition of delivery of nutrients via TPN is not medically indicated. Calvin's disagreement with decisions regarding his medical care does not satisfy the subjective element of a deliberate indifference claim. As shown above, Calvin has not shown a substantial likelihood of success on his deliberate indifference claim.

**B.    Calvin has failed to exhaust administrative remedies.**

Calvin does not have a substantial likelihood of success on the merits because he failed to exhaust his administrative remedies. Under the Prison Litigation Reform Act ("PLRA") prisoners bringing suit under § 1983 must exhaust all available administrative remedies before seeking relief in federal court. *Smith v. Rudicel*, 123 Fed. Appx. 906, 907 (10th Cir. 2005). The law plainly states that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. 1997e. "The statutory exhaustion requirement of § 1997e(a) is mandatory." *Beaudry v. Corr. Corp. of Am.*, 331 F.3d 1164, 1167 n.5 (10th Cir. 2003). The exhaustion requirement is also a total exhaustion requirement, and it applies to "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege

- 19 -

excessive force or some other wrong." *Horton v. Ortiz*, 138 Fed. Appx. 104, 106 (10th Cir. 2005). "The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones v. Bock*, 549 U.S. 199, 218, 127 S. Ct. 910 (2007).

The grievance procedure for KDOC prisoners is described fully in Kansas Administrative Regulations §§ 44-15-102. The KDOC mandates a four-step grievance procedure: (1) an attempt at informal resolution; (2) a grievance report submitted to the appropriate unit team member; (3) submission of the grievance to the warden; and (4) submission of the grievance to the Secretary of Corrections. *Barnett v. Kansas*, No. 16-3008-SAC-DJW, 2016 WL 3618655, at *3 (D. Kan. July 6, 2016).

In the case at bar, the evidence shows that Calvin has not filed a grievance appeal with the Secretary of Corrections regarding access to counsel, recent medical care, or familial association. Calvin is lucid and able to contact medical staff, who are available 24/7, at any time. There has been nothing to prevent Calvin from engaging in the grievance appeal process. He has not done so. Therefore, Calvin is unlikely to succeed on his claims.

      **C.**     **<u>Calvin does not have a substantial likelihood of success on his claims regarding access to his attorneys and his family</u>.**

Calvin claims that the defendants have limited his access to the courts.  But there is all evidence to the contrary.  For starters, Calvin was able to obtain counsel to file the emergency petition to preserve testimony in Johnson County District Court.  The emergency petition was granted.  Calvin was able to give testimony at his December 22, 2022, deposition at EDCF.  Then, Calvin's counsel filed yet another lawsuit – this action.  Further, as shown above, Calvin has repeatedly been allowed contact with his attorneys.  See Shearburn Declaration, Exhibit C.  In fact, occasionally it has been Calvin's decision to not have contact with his attorneys.

As for Calvin's claim that he has not been allowed access to his family, KDOC personnel has logged at least 520 minutes of phone calls between him and his family since December 7, 2022.  See Exhibit C, ¶ 5.  Calvin has had numerous in-person visits, including a visit that lasted eight hours.  Again, Calvin is lucid and able to contact medical staff, who are available 24/7, at any time.  There has been nothing to prevent Calvin from being in contact with his family.

For these reasons, Calvin has not shown a substantial likelihood of prevailing on his claims that KDOC limited his access to the courts, counsel, or family.

**IV.**    **Calvin is Not Entitled to a Second Deposition.**

Calvin claims that he should be allowed to give additional testimony by way of deposition because Calvin's counsel allegedly did not have access to Calvin's medical records at the time of his December 22, 2022 deposition.  However, Calvin was

questioned extensively by his counsel about his medical care up to and including

medical care provided on December 22, 2022.  Calvin explained the treatment he's

received, and about his medical condition, health, and well-being from 2017 to the

present.  Calvin has not offered any evidence to show that he was not able to articulate

his medical condition and treatment at the time of his deposition.

In addition, at the time of his deposition Calvin and his counsel contemplated the

possibility of a Section 1983 lawsuit based on his innocence.  (See Complaint, footnote 1,

pp. 1-2)  Plaintiff testified extensively regarding his underlying criminal case that

resulted in his incarceration.  Calvin has not offered any reason why he was unable to

testify on December 22, 2022, regarding his innocence claims.

Calvin has not made a strong showing that he is entitled to a preliminary

injunction allowing for a second deposition, an extraordinary remedy without the

additional close scrutiny that accompanies a request to alter the status quo and force

defendants to take action.

For all the foregoing reasons, Calvin's motion for an emergency preliminary

injunction should be denied.

Respectfully submitted,

OFFICE OF ATTORNEY GENERAL
DEREK SCHMIDT

s/Shon D. Qualseth
Shon D. Qualseth, KS Sup. Ct. No. 18369
Assistant Attorney General/Senior Trial Counsel
Memorial Bldg., 2nd Floor
120 SW 10th Avenue
Topeka, Kansas 66612-1597
Tel:  (785) 368-8424
Fax:  (785) 291-3767
Email:  shon.qualseth@ag.ks.gov
*Attorney for Defendants State of Kansas and Warden
Tommy Williams*

**CERTIFICATE OF SERVICE**

I certify that on this 4th day of January, 2023, I electronically filed this Response to Plaintiff's Motion for Emergency Injunction using the CM/ECF system, which will send electronic notification of such filing to all counsel of record.

s/Shon D. Qualseth
Shon D. Qualseth