## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| JOHN KEITH CALVIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 5:22-cv-03317-JWL-JPO |
| | ) | |
| STATE OF KANSAS, DEPARTMENT OF | ) | |
| CORRECTIONS, et al. | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM IN SUPPORT OF COMPLAINT

COMES NOW Plaintiff, by and through his undersigned counsel, in support of his Complaint and in opposition to the KDOC's Response, advises the Court of the following:

### BACKGROUND

No one – including KDOC – disagrees that John Calvin is dying a painful death alone in prison with little time remaining. And KDOC is well aware that Calvin has siblings, children, grandchildren, and attorneys who have or would visit him (or more often), given the opportunity. Yet KDOC has taken numerous steps to frustrate and prevent access of these people to Calvin. Simultaneously, and for years, KDOC failed to provide Calvin proper medical treatment. Recent events are only the latest examples of KDOC's deliberate indifference to Calvin's serious medical needs, a situation that extends well back in time.

For nearly a year, John Calvin has demonstrated clear symptoms that the cancer he was treated for in 2017 had returned. KDOC did nothing. By August and September, Calvin was jaundiced (his liver stopped functioning), losing weight, unable to eat most foods because abdominal tumors were consuming his body, interfering with the function of his abdominal organs, and in extreme pain. KDOC did nothing.

Not until November 23, 2022, after Calvin's weight dropped from 180-175 pounds to well under 140 pounds, with pain scaled at 10/10 and remaining at 7/10 when given powerful narcotics, whose condition was described by KDOC as "already perilous," and with him leaving "blood clots visible in [the] toilet," did KDOC finally decide he could be taken to a hospital that could provide needed medical care. But it was too late. The hospital's attempt at surgery to relieve some of his distress discovered a man with metastasized cancer that was too far advanced to be effectively treated; a man now too weak to undergo most available treatment.

KDOC's indifference did not end there. Though Wesley Medical Center advised against returning Calvin to EDCF's infirmary – advising that it was unlikely KDOC could provide the care Calvin required – KDOC sent a car to pick him up from the hospital, with the intent to simply lay this terminally-ill, constantly-in-pain man in the back seat, despite multiple tubes exiting from his body.[1] But the hospital refused to release him into the backseat of a car, insisting that Calvin could only leave the hospital via ambulance.

When Calvin was returned to KDOC, both the "nutrition" he was provided and the regimen (if one could call it that) of pain relief were so inadequate as to beg for the label "deliberate indifference." For example, just days ago, KDOC served Calvin a nondescript "beef patty" and a "smoothie" comprised of a slice of Boston cream pie and a banana. Meanwhile, one of Calvin's nephrostomy tubes (inserted into his kidneys to drain urine out of his body) fell completely out of Calvin's body. But KDOC never noticed. Incredibly, KDOC did not even check the tube's placement when *Calvin* reported that his left bag was not collecting urine. Simply changing the bandage would have exposed the coiled tube, dislodged from Calvin's weak body.

---

[1] Despite producing other medical records from Wesley Medical Center during this stay, conspicuously absent are two critical days, including when Wesley refused to subject Calvin to KDOC's inhumane transportation plan.

Counsel will grant that since late December, after Calvin's heir filed an action in Kansas State Court to preserve Calvin's testimony and after the *second* hospitalization (to fix the undiscovered, dislodged nephrostomy tube), KDOC's efforts have slightly improved. But improved does not equal adequate and appropriate, as the attached affidavit from Dr. Sosinski, a doctor experienced and trained in palliative and hospice care, demonstrates. KDOC's actions have undoubtedly shortened Calvin's life and rendered his time, at least since September 2022, unconstitutionally painful.

KDOC subjected Calvin to cruelty and unnecessary pain. As demonstrated below, KDOC's Response raises legal arguments that fail on their face as a matter of law. And KDOC's "factual" affidavits are rife with incorrect and misleading assertions. Far from a model of inmate care, this case is an example of actions that far exceed simple negligence. KDOC has been deliberately indifferent to John Calvin's serious medical needs for a long time, and certainly over the past several months, both objectively and subjectively. And perhaps that is why KDOC resists any further deposition of Calvin about the medical events that have occurred and the records finally produced since his first deposition, which is what he seeks to address in a second deposition. Respectfully, Calvin has, can, and will demonstrate his entitlement to relief for KDOC's violations of the Eighth and First Amendments as incorporated by the Fourteenth Amendment.

But time is running out. It is doubtful Calvin will live for more than weeks, or, perhaps with adequate care, months. He needs relief as soon as possible. Every day counts, before KDOC sends Calvin to his grave prematurely with untold, unnecessary suffering. Unless relief is granted, John Calvin will never meet his grandbabies, even though he is within four months of possible parole for a crime he will demonstrate in another forum he did not commit. He would also like his

family and his lawyers to know his final wishes, including proceedings after his death, as well as to testify about KDOC's deliberate indifference.

## RESPONSE TO KDOC FACTS

1.      Plaintiff John Calvin ("Calvin") is a resident of the Kansas Department of Corrections. ("KDOC"). (Doc. 1 ¶ 2)

**Response:** Admitted.

2.      Calvin is serving a life sentence on state court felony convictions for felony first-degree murder and attempted robbery. (Doc. 1, ¶ 2, footnote 1, p. 1-2) See also *State v. Calvin*, 279 Kan. 193 (2005) (affirming life sentence).

**Response:** Admitted, with clarification that he is eligible for parole in April 2023.

3.      Calvin has not filed a grievance appeal with the Secretary of Corrections regarding access to counsel, recent medical care, or familial association. Declaration of Darcie Holthaus, ¶ 5. A copy of Darcie Holthaus's [sic] Declaration is attached as "Exhibit A."

**Response:** Denied. Calvin's counsel, on behalf of Calvin and pursuant to K.A.R. 44-15-106, has exhausted Calvin's administrative remedies by filing his grievance directly with the Secretary of Corrections. Natasha Carter, counsel for KDOC, directed Calvin's counsel to only communicate with KDOC through her. As a result, the grievance, pursuant to K.A.R. 44-15-106, was submitted directly to Ms. Carter. Ms. Carter only responded to one such grievance, and only to state that "Pursuant to KDOC policy, his location will not be disclosed," and "If Mr. Calvin is in the hospital for more than a day, we will arrange telephone calls."[2] Moreover, as set more fully below, Calvin is not obligated to exhaust his administrative remedies in order to obtain the relief sought in the Complaint.

---

[2] Email, Carter to Templeton, et al., December 23, 2022, attached as <u>Exhibit 4</u>.

*Facts regarding Calvin's Medical Care*

4.    Dr. Paige Dodson, M.D., is the Statewide Medical Director for Centurion of Kansas, LLC ("Centurion"). As Statewide Medical Director, her job duties include reviewing and management of the medical care provided by physicians and other medical personnel in KDOC facilities across the state of Kansas. Affidavit of Dr. Paige Dodson, M.D., ¶ 5. The Affidavit of Dr. Dodson is attached as "Exhibit B."

**Response:** Calvin lacks knowledge of Dr. Dodson, and therefore cannot admit or deny this paragraph.

5.    Dr. Dodson is familiar with the medical records of Calvin as maintained by Centurion. (Exhibit B, ¶ 3)

**Response:** Calvin lacks any information regarding Dr. Dodson's knowledge, and therefore cannot admit or deny this paragraph. From the face of Calvin's medical records, it is apparent that Dr. Dodson was not directly involved in treating Calvin, but was involved in approving requests for drugs and treatment by physicians who saw and treated Calvin.

6.    Centurion provides contractually-specified medical care at correctional facilities in Kansas. Generally, medical care is provided at the facility where an individual is incarcerated. If the facility does not have the ability to provide certain care, Centurion coordinates the provision of that care through local medical providers. (Exhibit B, ¶ 6)

**Response:** Admitted that Centurion is a contractor and agent of KDOC. However, KDOC alone is responsible for custody and control of inmates.[3]

7.    Palliative care, comfort care, supportive care and hospice care are all available to Centurion's patients. Centurion has considerable experience in these modalities as the mission of

---

[3] Email, Cox to Templeton, December 23, 2022, attached as <u>Exhibit 5</u> ("Inmate custody is entirely a KDOC matter. Centurion only provides medical care").

the El Dorado Correctional Facility ("EDCF") includes cancer care. Patients transfer from all over the State of Kansas to receive chemotherapy at the infirmary at EDCF, due to the experience of our clinicians there, and the proximity to our partner cancer treatment center. Patients receive cancer treatment including chemotherapy, surgical treatment, and/or radiation as directed by community physicians. Dr. Dodson and Centurion are active in co-management of these patients and transition to end-of-life care, if needed. This includes management of pain, nutrition, nausea, constipation and many other possible symptoms. In addition, we coordinate with KDOC to provide for spiritual and family support. (Exhibit B, ¶ 7)

**Response:** Calvin lacks any information regarding the availability of palliative care, comfort care, supportive care, or hospice care in part because Calvin has not received any such care from KDOC, and therefore cannot admit or deny this paragraph. KDOC has not offered any evidence in its supporting affidavits to demonstrate that KDOC is qualified to provide palliative or hospice care.

8.      According to his medical records, in 2017 Mr. Calvin was diagnosed with colon cancer and was treated with neoadjuvant chemotherapy and radiation in 2018. His cancer went into remission at that time. He was advised to pursue surgical resection of his colon as well, but he anticipated potential reversal of his conviction and so chose not to proceed with that procedure at that time. (Exhibit B, ¶ 8)

**Response:** Objection. This paragraph, including what Calvin "was advised to pursue," constitutes inadmissible hearsay. *Nelson v. Allstate Ins. Co.*, No. 92-2309-JWL, 1993 WL 105120, at *6 (D. Kan. Mar. 8, 1993) (ignoring inadmissible hearsay in an affidavit regarding a motion to dismiss because "[i]f a submitted affidavit contains relevant admissible material, then the court may rely on it in making its rulings. If the affidavit contains material that is not admissible or

relevant, then it will be ignored by the court"). The affiant, Dr. Dodson, was never involved in Calvin's medical care and therefore her belief of what Calvin was advised is textbook hearsay. Admitted that Mr. Calvin had colon cancer in 2017 which was treated with chemotherapy and radiation. However, following this treatment, Calvin was repeatedly told that he was "healed" and cancer-free.[4] No one at KDOC has ever told Calvin that he still has cancer – the first to do so was a physician at Wesley Medical Center.[5]

9.      Following the initial treatment of his cancer, Mr. Calvin was followed by Dr. Dakhil, an oncologist, as well as through clinical visits at EDCF. Regular PET scans were conducted to detect any return of his cancer. In fall of 2022, around September, Mr. Calvin became jaundiced. His liver enzymes increased significantly as did his bilirubin. He lost about 20 pounds over approximately six weeks. This presented a concern that his cancer may have returned, and a work-up was initiated. (Exhibit B, ¶ 9)

**Response:** Admitted that KDOC assigned Dr. Dakhil to monitor Calvin's cancer. By no later than February 2022, KDOC knew Calvin's colon cancer had metastasized.[6] Despite this, KDOC failed to tell Calvin.[7] Admitted that on September 7, 2022, Calvin had a provider visit in which he was jaundiced, appeared chronically ill, and his liver enzymes were significantly elevated.[8]

10.      On November 23, 2022, Mr. Calvin's condition worsened. He experienced nausea, vomiting, and hematuria. Mr. Calvin was transferred to the hospital for further evaluation. (Exhibit B, ¶ 10)

---

[4] Calvin Depo., KDOC Response, Exhibit E at pp. 44:22-46:16.
[5] *Id.*
[6] February 9, 2022, Utilization Report, attached as <u>Exhibit 6</u>.
[7] Calvin Depo., KDOC Response, Exhibit E at pp. 44:22-46:16.
[8] September 7, 2022 Provider Visit Note, attached as <u>Exhibit 9</u> at p. 2.

**Response:** Admitted that under KDOC's care, Calvin's condition continued to worsen and KDOC finally agreed to transport Calvin to Wesley Medical Center. However, Calvin's condition did not suddenly worsen on November 23 – it had been worsening throughout the summer and fall of 2022. *See Additional Statement of Facts*, Nos. 3-13. KDOC's records support this: on November 23, 2022, KDOC stated, "Pt's already perilous status has declined more."[9]

11.     The hospital conducted an exploratory laparotomy procedure on December 13, 2022, which found that his abdominal cavity contained tumors that had eroded into the prostate and bladder. Bilateral nephrostomy tubes were placed. Mr. Calvin was declared by the hospital to require hospice care, and he was kept comfortable. Mr. Calvin was returned to EDCF and admitted to the infirmary as a hospice patient on December 16, 2022. (Exhibit B, ¶ 11)

**Response:** Admitted that Calvin had an attempted surgery on December 13, 2022, which found a massive spread of his cancer. Denied that the surgery was "exploratory"; Calvin was supposed to get a colostomy because of his bowel blockage, but it could not be performed because the tumors were so widespread.[10] Denied that Calvin has received hospice care from KDOC.[11]

12.     Since he returned to EDCF, Mr. Calvin's medical needs have been thoroughly and regularly assessed. Mr. Calvin is lucid, and able to contact medical staff, who are available 24/7, at any time. (Exhibit B, ¶ 12)

**Response:** Denied. KDOC is either unable or unwilling to adequately, much less "thoroughly and regularly" assess Calvin's condition. For example,

(A)     When Calvin returned to the EDCF infirmary on December 16, 2022, Dilaudid, 4mg every 4-6 hours was ordered.[12] However, because the EDCF infirmary lacked Dilaudid,

---

[9] November 23, 2022 Skilled Care Note, attached as <u>Exhibit 12</u> at pp. 1-2.
[10] December 13, 2022 Operation Procedure Report, attached as <u>Exhibit 15</u> at pp. 1-3.
[11] Affidavit of Dr. Sosinski, attached as <u>Exhibit 1</u>, at ¶ 7.
[12] December 16, 2022 Skilled Care Note, attached as <u>Exhibit 18</u> at p. 2.

Calvin would not receive his ordered pain medication until December 22, 2022.[13] No record KDOC has produced evidences any effort to procure the pain medication from another source, including Wesley Medical Center.

(B)     At 6:15 p.m., on December 16, 2022 KDOC's records indicate Calvin reported his pain as a 10/10, and the nursing staff documented him "moaning and holding abdomen" while requesting pain medication. Although given some Norco, an hour later, Calvin continued to moan and told the nurse that "it only helped a little bit." The nurse was only able to give Calvin a heating pad until a registered nurse was available and Dr. Harrod could be consulted. When Dr. Harrod was ultimately reached, he only authorized 6mg of morphine, despite an order permitting up to 8mg.[14]

(C)     As of December 23, 2022, Calvin's left nephrostomy tube was completely dislodged from his body and was coiled under the bandage.[15] This perilous condition existed for at least 5 days prior to discovery, despite Calvin himself alerting KDOC on December 21 that urine was not draining into his left nephrostomy bag.[16] Because of KDOC's inability to care for Calvin, he was rushed to Wesley Medical Center for continued, and proper, care.[17]

13.     Centurion staff are managing Mr. Calvin's pain through medication. He has been prescribed 4mg Dilaudid every 4-6 hours as needed and morphine 8-12 mg intravenously every 4-6 hours as needed. Because he is in the infirmary, nurses round on him approximately every two hours. Records reflect that Mr. Calvin had previously not requested any adjustments to his pain medication regimen until it was last adjusted today, January 4, 2023. This morning, Dr. Dodson

---

[13] December 21, 2022 Skilled Care Note, attached as <u>Exhibit 19</u> at pp. 1-2.
[14] December 16, 2022 Skilled Care Note, attached as <u>Exhibit 20</u> at p. 3.
[15] KDOC Skilled Care Note, December 23, 2022, attached as <u>Exhibit 23</u> at p. 3.
[16] Affidavit of Dr. Sosinski, attached as <u>Exhibit 1</u>, at ¶ 8, a-f.
[17] *Id.*

approved an increase to Mr. Calvin's prescription to morphine 10-15 mg IV or IM every 4-6 hours. (Exhibit B, ¶ 13)

     **Response:** Admitted that this is the plan being administered by KDOC. Denied that Calvin's pain is being appropriately managed.[18]

     14.    Mr. Calvin's current pain medication dosing regimen is significant. Higher dosages would likely cause constipation, urinary retention, sedation, or even hallucinations. Mr. Calvin is already experiencing abdominal distention due to slow colonic transit as a likely result of the pain medications. Mr. Calvin's pain is managed as well as can be expected given his metastatic cancer, and is managed appropriately for his goals of care. (Exhibit B, ¶ 14)

     **Response:** Denied that Calvin's pain is being appropriately managed.[19]

     15.    Although Mr. Calvin has lost some weight, he has not lost 70 pounds since September of 2022. Mr. Calvin's historical steady weight has been around 170 pounds. On August 31, 2022, Mr. Calvin weighed 160 pounds. On November 14, 2022, he weighed 154 pounds. As of January 3, 2023, he weighs 129.1 pounds. (Exhibit B, ¶ 15)

     **Response:** KDOC's own medical records state that Calvin cannot be weighed "due to pain level."[20] Mr. Calvin has testified that he believes he has lost 70 pounds.[21]

     16.    Mr. Calvin is able to consume food, pass gas, and have bowel movements. This indicates that his digestive tract is working. He has an unrestricted diet and may eat anything that

---

[18] Affidavit of Dr. Sosinski, attached as <u>Exhibit 1</u>, at ¶¶ 6-12; Affidavit of Kiardra Calvin, attached as <u>Exhibit 2</u> at ¶¶ 8-6; 19; 20-21; 24; 26; Affidavit of Jalisa Bluford, attached as <u>Exhibit 3</u> at ¶¶ 10; 12; 22; 24-26.
[19] Affidavit of Dr. Sosinski, attached as <u>Exhibit 1</u>, at ¶¶ 9-12; Affidavit of Kiardra Calvin, attached as <u>Exhibit 2</u> at ¶¶ 8-6; 19; 20-21; 24; 26; Affidavit of Jalisa Bluford, attached as <u>Exhibit 3</u> at ¶¶ 10; 12; 22; 24-26.
[20] December 16, 2022 Skilled Care Note, attached as <u>Exhibit 20</u> at p. 2.
[21] Calvin Depo., KDOC Response, Exhibit E at p. 20:4-6.

is available at the facility. He is able to have additional nutritional shakes (Ensure) three times a day. His oral intake has been improving. (Exhibit B, ¶ 16)

**Response:** Admitted that KDOC has placed Calvin on an "unrestricted diet," as evidenced by their serving him a "beef patty" and a "smoothie" comprised of a slice of Boston cream pie and a banana.[22] Denied that KDOC is providing Calvin with adequate nutrition.[23]  Denied that his digestive tract is "working": eating causes extreme pain, gas, and burping; he has numerous tumors and blockages throughout his abdomen and his required colostomy surgery was aborted.[24]

17.     Because Mr. Calvin's digestive system is operative, delivery of nutrients via Total Parenteral Nutrition ("TPN") is not medically indicated in Mr. Calvin's case. TPN does not reverse weight loss, rather it is designed to prevent further deterioration. It is generally reserved for situations where a patient is unable to take food orally. Physicians at the hospital have not recommended TPN in Mr. Calvin's two admissions. (Exhibit B, ¶ 17)

**Response:** Admitted that KDOC has failed to provide a TPN line. Denied that KDOC is providing Calvin with adequate nutrition.[25] The food is not nutritious, and Calvin is not being provided high protein supplements.[26]

18.     TPN also carries serious risks including infection. TPN is typically delivered via a central venous catheter. This type of catheter must be surgically placed in close proximity to the heart. TPN consists of nutrients – sugars, proteins, fats, etc. – that are food for bacteria just as much as for human beings. This creates a high risk of infection. At least ten percent of the time that nutrition is delivered via TPN, a serious infection results. When TPN is used long-term, rather

---

[22] Affidavit of Kiardra Calvin, attached as Exhibit 2 at ¶ 22; Affidavit of Jalisa Bluford, attached as Exhibit 3 at ¶¶ 18; 22-24.
[23] Affidavit of Dr. Sosinski, attached as Exhibit 1, at ¶ 9(b).
[24] Affidavit of Dr. Sosinski, attached as Exhibit 1, at ¶ 9(a)-(d).
[25] Affidavit of Dr. Sosinski, attached as Exhibit 1, at ¶ 9(b).
[26] Affidavit of Jalisa Bluford, attached as Exhibit 3 at ¶¶ 18; 22-24.

than short term during hospitalization as it is intended, the rate of infection increases. An infection

of this type could be fatal for an immunocompromised individual such as Mr. Calvin. (Exhibit B,

¶ 18)

**Response:** Admitted that KDOC has failed to provide a TPN line. Further admitted that

KDOC's records lack any evidence of a nutrition plan for Calvin, despite 3 daily Ensures. Denied

that KDOC is providing Calvin with adequate nutrition.[27] Further, should Calvin require a TPN

line in the future, KDOC's inability to manage nephrostomy tubes suggests they cannot be

entrusted with the responsibility of managing a TPN line.

### Facts regarding Access to Family and Counsel

19.     Calvin is currently housed in the infirmary at the EDCF. Declaration of Kirbie Todd

Shearburn, ¶ 3. The Declaration of Kirbie Shearburn is attached as "Exhibit C."

**Response:** Admitted.

20.     Ms. Shearburn is familiar with Mr. Calvin and his current health conditions. Ms.

Shearburn is the designated person who interacts with families when residents pass away or go

off-site for emergent medical care. (Exhibit C, ¶ 3)

**Response:** Calvin lacks knowledge of Ms. Shearburn's knowledge or her duties, and

therefore cannot admit or deny this paragraph. Ms. Shearburn's affidavit does not supply any facts

that demonstrate that she is qualified to manage or provider palliative or hospice care.

21.     Ms. Shearburn also oversees the hospice program. Ms. Shearburn has almost

exclusively been handling Calvin's requests for communications. (Exhibit C, ¶ 3)

**Response:** Calvin lacks knowledge of Ms. Shearburn's duties, and therefore cannot admit

or deny whether she oversees "the hospice program." Admitted that, if true, Ms. Shearburn is not

---

[27] Affidavit of Dr. Sosinski, attached as <u>Exhibit 1</u>, at ¶ 9(b).

qualified to do so.[28] Further admitted that Shearburn is an employee of KDOC, not Centurion. Admitted that Shearburn has almost exclusively handled *Calvin's* requests for communications, but that KDOC has required counsel for Calvin to request legal calls and visits through an attorney in Topeka, Kansas.

22.    During his November and December stays at Wesley Hospital, Calvin was allowed to make calls to family upon request. (Exhibit C, ¶ 4)

**Response:** Because Calvin is not permitted to have regular, unmonitored and unrecorded contact with legal counsel, this fact cannot be admitted or denied at this time.

23.    While in the hospital, Calvin was allowed to make legal calls upon his own request, and upon the request of counsel. (Exhibit C, ¶¶ 4, 8, 11)

**Response:** Denied. On at least one occasion, KDOC expressly **<u>denied</u>** counsel's request for a legal call with Calvin.[29] KDOC claimed Calvin was being returned to EDCF that day, which was not true – Calvin returned on December 16th – two days later.[30]

24.    Since December 7, 2022, Calvin has spoken by phone to family on numerous occasions:

Footnote 1: Calvin's contact with family is extensive, extending well beyond the dates and times listed. For brevity, Defendants attach only the portion relevant to the time period alleged in the Complaint. Comprehensive call logs can be provided upon request.

   a.   December 7 (11 minutes);

   b.   December 8 (55 minutes);

   c.   December 9 (100 minutes);

---

[28] Affidavit of Dr. Sosinski, attached as <u>Exhibit 1</u>, at ¶¶ 2-4; 10-12.
[29] Email, Pilate to Carter, et al., December 15, 2022, attached as <u>Exhibit 24</u> at pp. 3-4; *See also* KDOC's Statement of Facts, Nos. 26-27.
[30] *Id.*

d.  December 10 (20 minutes);

e.  December 11 (55 minutes);

f.  December 12 (82 minutes);

g.  December 13 (6 minutes);

h.  December 14 (28 minutes);

i.  December 15 (20 minutes);

j.  December 25 (40 minutes);

k.  December 26 (three calls made totaling 6 minutes);

l.  December 27, 2022 (20 minutes);

m.  December 29, 2022 (43 minutes);

n.  January 1, 2023 (five calls – 13 minutes, 2 minutes, 3 minutes, 7 minutes, 6 minutes);

o.  January 3, 2023 (3 minutes).

(Exhibit 5, ¶ 5)

**Response:** Admitted that calls occurred as noted.  Denied that such calls are "extensive" or adequate.

26.    Since December 1, 2022, Calvin has had in person visits with family twice. Two more visits were offered but declined by his family. Two visits were scheduled, but cancelled, when Calvin was transferred to Wesley Medical Center. (Exhibit 6, ¶ 6)

**Response:** Admitted. Further admitted that these visits were cancelled unilaterally by KDOC, and Calvin's family was not permitted to visit him in the hospital or told his condition.

26.    During Calvin's first hospital stay, his counsel requested calls on December 12, December 14, and December 16, 2022. The December 12th and December 16th calls were approved

and occurred. The December 14th call was denied as Calvin was due to be transported back to EDCF and could make a legal call from the facility. (Exhibit C, ¶ 8)

**Response:** Admitted. Further admitted that Calvin was not transported back to EDCF on December 14, but consequently was not permitted to speak with counsel until after he was transported back to EDCF on December 16.

27.     On December 14, 2022, when denying the legal call from the hospital due to transporting Calvin back to the facility, Calvin's counsel was advised that she could speak to him in the morning once he returned to the facility and was also offered an in person visit, to which she never responded. (Exhibit C, ¶ 9)

**Response:** Denied. The email chain, which speaks for itself directly controverts KDOC's purported fact.[31] Moreover, although KDOC claimed it denied the legal call because Calvin was being returned to EDCF and could have a legal call "when he returns to the facility," this was not true; Calvin did not return to EDCF until December 16, 2022.[32] Moreover, despite a history of legal calls with Attorney Pilate, KDOC suddenly demanded the completion of a "form" to permit future privileged calls.[33]

28.     During Calvin's second hospital stay, he was approved for legal calls but never requested one. Nor was a request received from his counsel. Instead, Mr. Calvin informed staff that he was only requesting calls with his wife and was not requesting legal calls because "they stress [him] out." (Exhibit C, ¶ 10)

---

[31] Email, Pilate to Carter, et al., December 15, 2022, attached as Exhibit 24.
[32] KDOC Statement of Facts, No. 11.
[33] Email, Pilate to Carter, et al., December 15, 2022, attached as Exhibit 24 at pp. 1-2.

**Response:** Denied. Calvin's stress and pain results from being forced to sit in a wheelchair to talk on the phone.[34] Sitting down compresses Calvin's abdomen and causes pain.[35] Despite a phone jack next to Calvin's bed in the EDCF infirmary, KDOC requires him to painfully transfer to a wheelchair and sit while talking on the phone.[36]

29.     Since his return to the facility, counsel has requested calls on the following dates:

    a.   December 20, 2022 (43 minutes in length);

    b.   December 21, 2022 (three calls – 3 minutes, 13 minutes, and 17 minutes);

    c.   December 23, 2022 (call arranged but Calvin taken to hospital before completion);

    d.   January 3, 2023 (30 minutes in length).

(Exhibit C, ¶ 11)

**Response:** Denied. Beginning on December 23, 2022, Calvin's counsel requested daily legal calls "every day for the next week (at least) so that we can take care of Mr. Calvin's legal affairs under these pressing circumstances."[37] The request was ignored by KDOC.

30.     Mr. Calvin requested a legal call on December 29, 2022 (43 minutes in length) and attempted to place three legal calls to counsel on January 1, 2023 but received no answer. (Exhibit C, ¶11)

**Response:** Admitted. Regarding the January 1, 2023 phone calls, counsel has determined KDOC provided Calvin with counsel's office phone number instead of her cell phone, which she has requested be used.

31.     Since at least November 1, 2022, Calvin's counsel has made no requests for in person legal visits, even when offered. (Exhibit C, ¶ 12)

---

[34] Affidavit of Jalisa Bluford, attached as <u>Exhibit 3</u> at ¶ 26.
[35] *Id.*
[36] *Id.*
[37] Email, Pilate to Carter, et al., December 23, 2022, attached as <u>Exhibit 28</u> at p. 1.

**Response:** Denied. At the time of his first deposition, counsel conducted in person legal visits before and after the deposition. Admitted that KDOC offered a legal visit hours before the hearing with Judge Hauber, Johnson County District Court Judge, regarding the ordered deposition.

32.     Calvin has not received confidential legal mail since November 29, 2022. (Exhibit C, ¶ 12)

**Response:** Admitted.

### Facts regarding Disclosure of Location

33.     Joel Hrabe is employed by the KDOC as the Deputy Secretary of Facility Management. Declaration of Joel Hrabe, ¶ 1. The Declaration of Joel Hrabe is attached as "Exhibit D."

**Response:** Calvin lacks knowledge of Mr. Hrabe, and therefore cannot admit or deny this paragraph.

34.     Mr. Hrabe is familiar with the procedures for managing and housing special needs residents, including residents sent outside the facility for medical care. (Exhibit D, ¶ 2)

**Response:** Calvin lacks knowledge of Mr. Hrabe's knowledge, and therefore cannot admit or deny this paragraph.

35.     Security considerations for out of facility transports, to include medical appointments or hospitalizations, require the KDOC to conduct a security assessment reviewing information such as the resident's current crime of conviction and sentence, past criminal history to including previous escape(s), history of violence, history of disruption, and or history of influence causing violation or disruption, the high profile nature of the current offense, the

residents institutional adjustment to include disciplinary reports, security threat group affiliation or any other specialized skills or issues associated with the resident. (Exhibit D, ¶ 3)

**Response:** Because Mr. Hrabe fails to provide citation to *any* KDOC regulations or policies, Calvin lacks knowledge of what Mr. Hrabe believes to be applicable KDOC policies and therefore cannot admit or deny this paragraph.

36.     Other related factors may include the resident's behavior health status, members of the public imposing influence to include threats or coercion on facility staff or medical personnel, and or anticipation of unauthorized visitors at the location of the resident. (Exhibit D, ¶ 3)

**Response:** Because Mr. Hrabe fails to provide citation to *any* KDOC regulations or policies, Calvin lacks knowledge of what Mr. Hrabe believes to be KDOC applicable policies and therefore cannot admit or deny this paragraph.

37.     Further, the warden may incorporate appropriate provisions when a resident is hospitalized and impose such security procedures as are determined to be appropriate based on the offender's individual circumstances. Such security procedures may include, restrictions on visitation or denial of visitation during the period of hospitalization, restrictions on telephone calls or denial of telephone calls during the period of hospitalization, restrictions on notifications to the offender's family regarding the location of the hospitalization, requests that the hospital not release any information regarding the offender including the offender's presence as a patient at the hospital, and if necessary increase the number of corrections officers providing security at the hospital. (Exhibit D, ¶ 4)

**Response:** Because Mr. Hrabe fails to provide citation to *any* KDOC regulations or policies, Calvin lacks knowledge of what Mr. Hrabe believes to be applicable KDOC policies and therefore cannot admit or deny this paragraph.

38.     Such limitations, when imposed, serve to preserve a safe environment for the health care workers, resident, and KODC staff. In addition, outside influence involving the medical care and treatment of residents through threat of litigation, high pressure through excessive calls or communications by family, and or similar acts to providers impedes treatment of the resident and often hinders future viability of continued health care with those providers or health care entity. (Exhibit D, ¶ 5)

**Response:** Because Mr. Hrabe fails to provide citation to *any* KDOC regulations or policies, Calvin lacks knowledge of what Mr. Hrabe believes to be applicable KDOC policies and therefore cannot admit or deny this paragraph.

39.     Given the high-profile nature of Mr. Calvin's conviction, and the issues caused by what appear to have been threats made to outside medical providers, disclosing Mr. Calvin's location when outside the secure perimeter of the correctional facility has been determined by the Department to be a security risk. Prior interactions by Mr. Calvin's family and/or agents impede the ability of the Department to timely and efficiently receive information regarding the resident and threatened the future viability of continued health care with those providers. (Exhibit D, ¶ 6)

**Response:** Objection. The affidavit, providing merely conclusory statements and devoid of facts, is inappropriate and fails to aid KDOC in meeting its burden. *Janny v. Gamez*, 8 F.4th 883, 889 (10th Cir. 2021) (describing standards for affidavits in context of summary judgment). For example, the affidavit lacks any facts describing "the high-profile nature of Mr. Calvin's conviction," "threats made to outside medical providers," or "prior interactions by Mr. Calvin's family and/or agents" that "impede the ability of [KDOC] to timely and efficiently receive information regarding the resident and threatened the future viability of continued health care with those providers." Although there is a split in the District of Kansas as to whether *Twombly/Iqbal*'s

pleading standards apply to affirmative defenses, *Constr. Indus. Laborers Pension Fund v. Explosive Contractors, Inc.*, No. 12-2624-EFM, 2013 WL 3984371, at *1 (D. Kan. Aug. 1, 2013), the affidavit is nevertheless unreliable because it merely contains conclusions without specific facts. Moreover, denied. The only "high-profile nature of Mr. Calvin's conviction" is the unassailable fact that he is innocent, and there have been no "threats made to outside medical providers."

### *Facts regarding Calvin's December 22, 2022 Deposition*

40.     On December 16, 2022, plaintiff filed an Emergency Petition Seeking Perpetuation of Testimony in Johnson County, Kansas pursuant to K.S.A. 60-227 to preserve plaintiff's testimony by deposition. (Complaint, footnote 2, p. 2)

**Response:** Admitted.

41.     The deposition took place on December 22, 2022 at the El Dorado Correctional Facility. A copy of the deposition transcript is attached as "Exhibit E."

**Response:** Admitted.

42.     Calvin was questioned extensively by his counsel about his medical care, up to and including medical care provided on December 22, 2022. (Exhibit E, 13:24-56:7)

**Response:** Admitted that counsel questioned Calvin about his medical care. Denied that counsel were able to question Calvin about his care during November and December 2022 because KDOC refused to provide counsel with Calvin's medical records of that care.

43.     Calvin was also questioned extensively regarding his underlying criminal case that resulted in his incarceration and his claims of innocence. (Exhibit E, 56:8-82:10)

**Response:** Admitted.

44.     On December 30, 2022, plaintiff filed this current lawsuit.

**Response:** Admitted.

<u>STATEMENT OF ADDITIONAL FACTS</u>

1.      Calvin, a model prisoner with a nearly spotless record,[38] was transferred from Lansing prison in 2017 to EDCF, in part, to continue his 16-year employment with a private company providing screen printing and embroidery services with prison employees. In his role as a Facilitator, Calvin was paid $15.00 per hour to supervise 20-25 other inmates.[39]

2.      After being treated with chemotherapy and radiation for colorectal cancer in 2017, Calvin was told by Dr. Dakhil (KDOC oncologist) that Calvin was "cured" and "clean" with "no signs of cancer."[40]

*Additional Facts Regarding Calvin's Medical Care*

3.      On January 27, 2022, a CT scan showed "Development of what appears to be prominent right internal mammary chain lymph node on the right at the level of the aortic arch. This, as well as .6 cm anterior right costophrenic sulcus nodule, would be consistent with metastatic lesions," and he was scheduled for a PET scan.[41] The PET scan showed "low level omental activity," with an assessment of rectal cancer.[42] However, Dr. Dakhil (Calvin's KDOC oncologist) "stated opinion that malignancy was not likely."[43]

4.      On September 7, 2022, Calvin's weight had dropped to 158 lbs., and he was described as chronically ill-appearing, jaundiced in the central face, with continuing poor appetite, some nausea, bloating, some general abdominal discomfort, and sensation of fullness along flanks,

---

[38] https://kdocrepository.doc.ks.gov/kasper/search/detail?kdocNumber=77541.
[39] Calvin Depo., KDOC Response, Exhibit E at pp. 28:16-30:25.
[40] Calvin Depo., KDOC Response, Exhibit E at pp. 22:4-27:17
[41] February 9, 2022 Utilization Report, attached as <u>Exhibit 6</u>.
[42] April 5, 2022 Oncology Progress Note, attached as <u>Exhibit 7</u>.
[43] June 1, 2022 Provider Visit Note, attached as <u>Exhibit 8</u>, at p. 1.

with liver enzymes that were significantly elevated.[44] By September 26, 2022, Calvin lost another 8 lbs.[45]

5.      On November 22, 2022, Calvin reported his pain as a 10/10 with "scant amount of bright red bleeding from pt's urethra noted."[46] The following day, after learning of "vomiting, then experienced gross hematuria" with "passed blood clots" and "right flank and back pain," KDOC noted "**Pt's already perilous status has declined more.** With weight loss, new onset gross hematuria, and recent jaundice, pt is sent out to Wesley Med. Center via state vehicle for further evaluation."[47]

6.      Despite all this, KDOC never told Calvin he still had cancer, his cancer metastasized into other critical organs, his test results indicated cancer, or his pain was the result of cancer.[48] Instead, a doctor at Wesley Medical Center was the first person to tell Calvin that his cancer was back.[49] At some undescribed time before being transferred, Calvin reported "I have blood in urine, I continue to have lack of bladder control when I thought it was clear. Need to see care provider ASAP. Please need Help. NSC for 11/24/2022 late entry," but KDOC did not provide Calvin with a provider to evaluate this request.[50]

7.      At Wesley Medical Center (during his first hospitalization), Calvin weighed 149 lbs.,[51] received nephrostomy tubes, and his physicians aborted an attempted diversion of his colon after opening Calvin's abdomen and discovering it was full of tumors.[52]

---

[44] September 7, 2022 Provider Visit Note, attached as Exhibit 9 at p. 2.
[45] September 26, 2022 Provider Visit Note, attached as Exhibit 10 at p. 2.
[46] November 22, 2022 Nurse Visit Note, attached as Exhibit 11 at pp. 1-2.
[47] November 23, 2022 Skilled Care Note, attached as Exhibit 12 at pp. 1-2.
[48] Calvin Depo., KDOC Response, Exhibit E at pp. 44:22-46:16.
[49] *Id.*
[50] November 28, 2022 Nurse Visit Note, attached as Exhibit 13 at p. 1.
[51] November 23, 2022 Hospitalist History & Physical, attached as Exhibit 14 at p. 3.
[52] December 13, 2022 Operation Procedure Report, attached as Exhibit 15 at pp. 1-3; Calvin Depo., KDOC Response, Exhibit E at pp. 45:17-46:16.

8.      On December 13, 2022, Wesley Medical Center diagnosed Calvin with "severe protein calorie malnutrition" and planned, in response to the failed colon diversion, for Dr. Dakhil (Calvin's oncologist) to restart treatment for metastatic rectal carcinoma on an outpatient basis.[53] However, to date, KDOC has failed to provide a consult with Dr. Dakhil, let alone treatment for Calvin's tumors.[54] Wesley Medical Center determined Calvin had a "poor prognosis, will likely be reliant on multiple tubes once discharged and **will need close cares that may not be suitable or appropriate for him to return to his current facility**."[55]

9.      To date, KDOC has not produced Calvin's medical records from Wesley Medical Center for December 15 – December 16, 2023, including discharge records – despite producing Wesley records from other dates of service.

10.     Regarding standard nursing care, as more fully described in Dr. Sosinski's affidavit, Calvin's left nephrostomy tube remained "pulled out" of his body for 6 days, from December 17 to December 23, despite the fact that the lack of drainage was apparent from the face of KDOC's records – and was expressly called to KDOC's attention (and documented) by Calvin on December 21, or **two days before it was "discovered" by KDOC**.[56]

11.     Regarding pain management, Calvin received a PCA pump during his time at Wesley Medical Center, but KDOC has not provided this care.[57] Instead, morphine, Norco, and Dilaudid were ordered when Calvin returned to KDOC.[58] But because the EDCF infirmary lacked Dilaudid, it was not available to Calvin until a week later, on December 22, 2022.[59]

---

[53] December 13, 2022 Hospitalist Progress Note, attached as <u>Exhibit 16</u> at p. 4.
[54] Affidavit of Kiardra Calvin, attached as <u>Exhibit 2</u> at ¶ 10; 23; Calvin Depo., KDOC Response, Exhibit E at p. 47:17-23.
[55] December 13, 2022 Hospitalist Progress Note, attached as <u>Exhibit 16</u> at p. 7.
[56] Affidavit of Dr. Sosinski, attached as <u>Exhibit 1</u>, at ¶ 8, (a)-(f).
[57] December 16, 2022 Formulary Exception – Medication Note, attached as <u>Exhibit 17</u>.
[58] December 16, 2022 Skilled Care Note, attached as <u>Exhibit 18</u> at p. 2.
[59] December 21, 2022 Skilled Care Note, attached as <u>Exhibit 19</u> at pp. 1-2.

12.     As a result of KDOC's conduct, Calvin has needlessly experienced pain under KDOC care that Wesley Medical Center managed. For example, upon his return on December 16, 2022 to EDCF, by 6:15 p.m., Calvin reported his pain as a "Level 10," and the nursing staff documented his "moaning and holding abdomen" while requesting pain medication. An hour after receiving Norco, Calvin continued to moan and told the nurse that "it only helped a little bit." KDOC gave Calvin a heat pack. [60] By 10:35 p.m., Calvin requested pain meds, reporting his pain as an 8/10, but all KDOC offered was "encourage[ment] that he has additional pain meds that he can get soon" and to "encourage pt. to drink more fluids."[61] At 7:40 a.m. the next morning, December 17, Calvin received the top ordered dose of morphine (8mg), which wore off by 9:00 a.m.[62]

13.     On December 22, 2022, when Calvin was deposed to perpetuate his testimony, he estimated his weight was down to 120 pounds from a pre-illness 180 pounds.[63]

14.     On January 7, 2023, Calvin's attorneys-in-fact visited him at EDCF. Their observations mirror KDOC's prior deficient care and evidence a continuing lack of adequate pain management and nutrition:

a.     First, his pain has worsened, with Calvin appearing very uncomfortable with audible moaning and clutching of his chest from the pain. During their visit, Calvin complained of constant pain and ceaseless burping, which Calvin stated hurt his chest and kidneys.[64]

---

[60] December 16, 2022 Skilled Care Note, attached as Exhibit 20 at p. 3.
[61] December 17, 2022 Skilled Care Note, attached as Exhibit 21 at p. 3.
[62] December 17, 2022 Skilled Care Note, attached as Exhibit 22 at p. 3.
[63] Calvin Depo., KDOC Response, Exhibit E at p. 19:7-11.
[64] Affidavit of Kiardra Calvin, attached as Exhibit 2 at ¶ 20-21; Affidavit of Jalisa Bluford, attached as Exhibit 3 at ¶¶ 22-25.

b.     Second, he continues to starve to death. When food was brought to Calvin, it consisted of a nondescript "beef patty," mixed vegetables, and watery rice. Calvin described the pain he suffers when he tries to eat solid food and therefore did not eat the food KDOC provided. As a result, Calvin continues to lose weight. Calvin's primary care physician has stated he cannot change Calvin's food.[65] Calvin was also given an innutritious, sugary "smoothie" that contained a slice of Boston cream pie and a banana.[66]

### *Additional Facts regarding Access to Family and Counsel*

15.     On December 14, 2022, Calvin's counsel requested an immediate phone call.[67] In response, KDOC stated that the Warden and Deputy Warden were offsite, but Ms. Shearburn reached out "to get approval for another call."[68] Calvin's counsel then copied (i) two KDOC attorneys (Ms. Carter and Jon Graves, Esq.); (ii) Jeff Zmuda, Secretary of KDOC; and (iii) Joel Hrabe, Deputy Secretary of Facility Management.[69] Counsel explained that Calvin is terminally ill and put KDOC on notice that it was preventing Calvin from communicating with his counsel.[70] In response, KDOC denied the legal phone call.[71] Although KDOC claimed the reason was that Calvin was returning to EDCF, Calvin did not actually return to EDCF until two days later.[72]

16.     Despite Calvin's attorneys'-in-fact request, and Calvin's impending death, KDOC refused to allow visits more frequent than once per week.[73]

---

[65] Affidavit of Kiardra Calvin, attached as Exhibit 2 at ¶¶ 21-22.
[66] Affidavit of Jalisa Bluford, attached as Exhibit 3 at ¶ 23.
[67] Email, Pilate to Carter, et al., December 15, 2022, attached as Exhibit 24 at p. 5.
[68] *Id.*
[69] The email addresses for the Secretary of KDOC (Nancy.Burghart@ks.gov) and Deputy Secretary of Facility Management (KDOC_Facility_Management@ks.gov) are available at https://www.doc.ks.gov/contacts.
[70] Email, Pilate to Carter, et al., December 15, 2022, attached as Exhibit 24 at p. 4.
[71] *Id.* at pp. 3-4.
[72] KDOC Statement of Facts, No. 11.
[73] Affidavit of Kiardra Calvin, attached as Exhibit 2 at ¶ 17; Affidavit of Jalisa Bluford, attached as Exhibit 3 at ¶¶ 20-21.

17.     On December 23, 2022 and so his attorneys "can take care of Mr. Calvin's legal affairs under these pressing circumstances," Calvin's counsel requested "legal calls every day for the next week (at least)."[74] Counsel's request was entirely ignored by KDOC and its chief legal counsel never even bothered to respond.

18.     Also on December 23, 2022, Calvin's counsel emailed KDOC and requested a greater number of phone calls and visits for Calvin's "large and loving family."[75] KDOC refused to substantively respond to the request.

### *Additional Facts regarding Disclosure of Location*

19.     On December 23, 2022, the day before Calvin's attorneys-in-fact were supposed to visit him, KDOC called and informed them the visit was cancelled. Describing Calvin as KDOC's "property," KDOC refused to tell Calvin's attorneys-in-fact, or attorneys-at-law, Calvin's location.[76]

20.     KDOC then misrepresented Calvin's location – falsely telling Calvin's attorneys-in-fact that Calvin ***was not transported to Wesley Medical Center***.[77] Calvin's family is hours away from EDCF and Wichita and cannot possibly hope to see Calvin before he passes away without KDOC's transparency and honesty.

21.     Wesley Medical Center's medical records do not contain any reference to any "threats made to" outside medical providers. Nor do any records, either from Wesley Medical Center or KDOC reference or describe any "prior interactions by Mr. Calvin's family and/or agents [that] impeded the ability of the Department to timely and efficiently receive information

---

[74] Email, Pilate to Carter, et al., December 23, 2022, attached as Exhibit 28 at p.1.
[75] Email, Carter to Templeton, et al., December 23, 2022, attached as Exhibit 29 at p. 5.
[76] Affidavit of Kiardra Calvin, attached as Exhibit 2 at ¶¶ 13-15; Affidavit of Jalisa Bluford, attached as Exhibit 3 at ¶¶ 15-17.
[77] Affidavit of Kiardra Calvin, attached as Exhibit 2 at ¶ 15; Affidavit of Jalisa Bluford, attached as Exhibit 3 at ¶ 15

regarding" Calvin or "threatened the future viability of continued health care with those providers."

### Additional Facts Regarding Calvin's December 22, 2022 Deposition

22.     On December 20, 2022, Calvin's counsel sent an email to KDOC's legal counsel, reminding KDOC that a medical records release had already been provided and they were required "before the deposition."[78] "Our past experience is that Centurion is able to quickly produce them. We also seek the records of Wesley Medical Center that have been provided to KDOC and/or the El Dorado Correctional Center. We await your response."[79] KDOC never responded and failed to produce the records before or at Calvin's December 22, 2022 deposition.

23.     On December 23, 2022, the day after the deposition, Calvin's counsel again requested the medical records.[80] KDOC refused to respond.

24.     On January 3, 2022, Calvin's counsel requested three sets of medical records from KDOC.[81] To date, KDOC has failed to produce them or even respond to the inquiry.

### Additional Facts regarding Exhaustion of Remedies under K.A.R. 44-15-201

25.     On December 14, 2022, Calvin's counsel notified KDOC of its violation of Calvin's First Amendment right to courts and access to counsel.[82] The same day, Calvin's counsel sent a separate notice to KDOC regarding its Eighth Amendment violations through its deliberate indifference to Calvin's medical needs, specifically including pain management.[83]

---

[78] Email, Pilate to Carter, et al., December 20, 2022, attached as <u>Exhibit 26</u>.
[79] *Id.*
[80] Email, Carter to Templeton, et al., December 23, 2022, attached as <u>Exhibit 29</u> at p. 4.
[81] Email, Pilate to Carter and Qualseth, et al., January 3, 2022, attached as <u>Exhibit 30</u> at p. 1.
[82] Email, Pilate to Shearburn, et al., December 14, 2022, attached as <u>Exhibit 24</u>.
[83] Email, Pilate to Shearburn, et al., December 14, 2022, attached as <u>Exhibit 25</u> at pp. 1-2.

26.     On December 21, 2022, Calvin's counsel notified KDOC of its Eighth Amendment violations through its deliberate indifference to Calvin's medical needs, specifically including pain management and nutrition.[84]

27.     On December 23, 2022, Calvin's counsel notified KDOC – *through four separate emails on the same chain* – of its First Amendment violations (through failure to provide necessary medical records for Calvin's attorneys to properly advise and counsel him and hiding Calvin so he cannot be contacted or visited by his counsel) and Eighth Amendment violations (through its deliberate indifference to Calvin's medical needs, specifically including pain management and nutrition).[85]

<u>ARGUMENTS AND AUTHORITIES</u>

## I.     <u>Standards for Issuance of Preliminary Injunction</u>

The standard for issuing a preliminary injunction under Fed. R. Civ. P. 65 is well established. The facts and situation here are such that "the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004); *accord Heritage Fam. Church, Inc. v. Kansas Dep't of Corr.*, No. 18-01259-EFM-KGG, 2018 WL 6065248, at *4 (D. Kan. Nov. 20, 2018). As a result, the Tenth Circuit's modified likelihood-of-success-on-the-merits standard is inapplicable. *Id.* at 976.

And Calvin notes that he is not seeking a mandatory injunction in the sense KDOC argues: he is not asking the Court to supervise his care and treatment, but rather simply to order his transfer to an established private facility that is experienced, capable, and competent in palliative and hospice care, with access to doctors of Calvin's choosing. Such an order will not require ongoing

---

[84] Email, Pilate to Carter and Qualseth, et al., December 21, 2022, attached as <u>Exhibit 27</u>.
[85] Email, Carter to Templeton, et al., December 23, 2022, attached as <u>Exhibit 29</u> at p. 1-4.

supervision by the Court. And, in any event, Calvin has not long to live. The potential time for court involvement here is short under any scenario.

## II.   Centurion is Not a Necessary Party

KDOC incorrectly claims Centurion must be joined under Rule 19(a)(1)(A) and (B), a claim that fails as a matter of law.

### a.   Subpart A is inapplicable because complete relief can be accorded without Centurion

First, "[c]omplete relief refers to relief as between the persons already parties to the action and not as between a present party and the absent party whose joinder is sought." *Champagne v. City of Kansas City, Kan.*, 157 F.R.D. 66, 67 (D. Kan. 1994). Therefore, whether Calvin might have a medical malpractice claim against his medical providers is immaterial at this junction. The Complaint does not seek damages for medical malpractice. The relief sought can all be obtained – and in fact is *properly obtained* – from KDOC, Calvin's custodian.

This is similar to a habeas petition, which must be directed to "the person who has custody of the person detained." *Rumsfeld v. Padilla*, 542 U.S. 426, 434 (2004) (citing 28 U.S.C. § 2242). Similarly, Calvin's custodians – the KDOC and the El Dorado Correctional Facility Warden – are named defendants. "Because complete relief can be granted without having [Centurion] as a party to the case, [Centurion] is not necessary within the terms of Rule 19(a)(1). *Salt Lake Trib. Pub. Co., LLC v. AT & T Corp.*, 320 F.3d 1081, 1097 (10th Cir. 2003).

Second, even if the Complaint sought damages for medical malpractice (which it does not), Centurion could not be sued for the medical malpractice of its physicians. The Kansas Legislature abrogated the vicarious liability of an employer health care provider. K.S.A. 40-3403(h); *Bair v. Peck*, 248 Kan. 824, Syl. 7, 811 P.2d 1176 (1991) (holding provision constitutional); *Treaster v. HealthSouth Corp.*, 442 F. Supp. 2d 1171, 1186 (D. Kan. 2006) (granting summary judgment in

favor of hospital due to K.S.A. 40-3403(h)'s abrogation of vicarious liability). As a result, Centurion cannot be a necessary party because it cannot be sued for medical malpractice on a vicarious liability theory. KDOC's oversight of Calvin's "hospice" care confirms this. In her affidavit, Ms. Shearburn states that she "oversee[s] the Hospice Program" [sic]. [DOC 13-3 at p. 2, ¶ 3]. But Ms. Shearburn is a KDOC – and *not* a Centurion – employee. [DOC 13-3 at p. 1, ¶ 1]. KDOC claiming Centurion is a necessary party is belied by the law and KDOC's own facts.

### b.   Subpart B is inapplicable because Centurion has not claimed an interest

Subpart B requires the absent person (and not a defendant) to claim an interest in the litigation. Fed. R. Civ. P. 19(a)(1)(B) ("*that person* claims an interest") (emphasis added). Therefore, only Centurion, and not KDOC, can raise a joinder argument under subpart B. *Hefley v. Textron, Inc.*, 713 F.2d 1487, 1498-99 (10th Cir. 1983) (denying joinder of persons who did not claim an interest in the action); *Roberts v. City of Fairbanks*, 947 F.3d 1191, 1204 (9th Cir. 2020) ("joinder is contingent…upon an initial requirement that the absent party *claim* a legally protected interest relating to the subject matter of the action") (internal citation and quotation omitted) (emphasis in original); *Davis Companies v. Emerald Casino, Inc.*, 268 F.3d 477, 483-84 (7th Cir. 2001) ("under Rule 19(a) it is the absent party that typically must claim such an interest"); *Peregrine Myanmar Ltd. V. Segal*, 89 F.3d 41, 49 (2d Cir. 1996) ("Segal's attempt to assert on behalf of the Ministry its supposed concern about [the case] falls outside the language of the rule. It is the absent party that must 'claim an interest'"); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Flanders-Borden*, 11 F.4th 12, 17 (1st Cir. 2021) (denying intervention, in part, because estate's executor failed to intervene on behalf of estate); *Perez v. W. Plains Transp., Inc.*, No. 13-1145-KHV-JPO, 2014 WL 61473, at *2; FN 11 (D. Kan. Jan. 8, 2014) ("because neither DFA nor Southwest Milk has claimed an interest in this action, sub-part (B) does not apply").

Here, Centurion has knowledge of this suit, as evidenced by KDOC's Response, which contains an affidavit from a Centurion officer. Despite this, Centurion has not claimed an interest in this case. As a result, KDOC cannot hide behind Rule 19(a)(1)(B).

### III.   Calvin Has Shown a Substantial Likelihood of Success on the Merits

#### a.   Calvin has shown a deliberate indifference to his medical needs

"Deliberate indifference" has two components: "an objective component requiring that the pain or deprivation be sufficiently serious; and a subjective component requiring that [prison] officials act with a sufficiently culpable state of mind." *Miller v. Glanz*, 948 F.2d 1562, 1569 (10th Cir. 1991); *Martinez v. Garden*, 430 F.3d 1302, 1304 (10th Cir. 2005).

#### i.   *Calvin has met the objective component*

In the objective analysis, the inmate must show the presence of a "serious medical need" that is "a serious illness or injury." *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976); *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A serious medical need includes "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980); *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999); *Martinez*, 430 F.3d at 1304 (quoting *Farmer*, 511 U.S. at 834 [quotation omitted]).

Here, this prong cannot be contested. Calvin is suffering from Stage 4 colon cancer that has metastasized into other vital organs. Additional Statement of Facts, Nos. 3, 9. This diagnosed illness is so serious that Wesley Medical Center recommended that Calvin not be returned to EDCF because his medical needs were so serious. Additional Statement of Facts, No. 9. Also well documented is Calvin's excruciating pain and "perilous status." Additional Statement of Facts,

No. 5. Simply put, Calvin has satisfied the first, objective, component of a claim for deliberate indifference to his medical needs.

### ii.   *Calvin has met the subjective component*

"The subjective component is met if a prison official knows of and disregards an excessive risk to inmate health or safety." *Martinez*, 430 F.3d at 1304 (citing *Sealock v. Colorado*, 218 F.3d 1205, 1209 [10th Cir. 2000] [quotation omitted]). In measuring a prison official's state of mind, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 1305 (citing *Riddle v. Mondragon*, 83 F.3d 1197, 1204 [10th Cir. 1996] [quotation omitted]). "This can be established when the risks would be obvious to a reasonable person. *Est. of Jensen v. Clyde*, 989 F.3d 848, 859 (10th Cir.) *cert. denied sub nom.*, 211 L. Ed. 2d 180, 142 S. Ct. 339 (2021) (citing *Mata v. Saiz*, 427 F.3d 745, 752 [10th Cir. 2005]).

Here, this prong cannot be seriously contested. First, KDOC readily admits its awareness of the substantial risk of serious harm from Calvin's serious, if not critical, medical condition. KDOC Statement of Facts, Nos. 9-15. Second, KDOC readily admits its own inference that Calvin is suffering from a substantial risk of serious harm. *Id.* Aware of Calvin's substantial risk of serious harm, KDOC has even taken the affirmative step of categorizing and treating Calvin as a "hospice" patient since December 16, 2022. In the alternative, the risks to Calvin are obvious to a reasonable person, as evidenced by the observations of Calvin's non-medical attorneys-in-fact and the medical personnel at Wesley Medical Center. Tellingly, Wesley Medical Center believed the risk of harm to Calvin was so serious that it took the incredible step of discouraging his transfer back to EDCF because Wesley did not believe EDCF could adequately care for Calvin.

### iii.   *Calvin's rights were clearly established*

Although not directly argued by KDOC, to the extent there is any doubt, "since at least 2014, the law has clearly established that when a detainee has obvious and serious medical needs, ignoring those needs necessarily violates the detainee's constitutional rights." *Paugh v. Uintah Cnty.*, 47 F.4th 1139, 1170 (10th Cir. 2022).

In summary, Calvin has a substantial likelihood of success on the merits of his deliberate indifference to his medical needs claim, under the Eighth Amendment, incorporated by the Fourteenth Amendment. Calvin's current state, and the care provided by KDOC is not an "unforeseeable accident" or "innocent misadventure," but rather "repugnant to the conscious of mankind." *Estelle*, 429 U.S. at 105 (quoting *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 464, 470-71 [1976]). Many of KDOC's failings occurred and continued *after* KDOC received repeated warnings from Calvin's counsel regarding Calvin's condition and the inadequacy of his nutrition and pain management, and *after* it was aware of Wesley's expressed concerns about KDOC's ability to provide appropriate care. In these circumstances, KDOC's conduct constitutes "an unnecessary and wanton infliction of pain." *Id.*

### b.   Calvin is not obligated to exhaust administrative remedies under the PLRA, but nevertheless has done so

KDOC complains that Calvin did not exhaust his administrative remedies under the Prison Litigation Reform Act ("PLRA"). But the PLRA's administrative exhaustion requirement does not apply to requests for injunctive relief. *Perkins v. Kansas Dep't of Corr.*, 165 F.3d 803, 808 (10th Cir. 1999) (holding § 1997e(e) does not affect declaratory or injunctive relief: "we agree with our sister circuits that § 1997e(e) does not affect actions for declaratory or injunctive relief"); *McKillip v. Norwood*, 2022 WL 17069582, at *2 (10th Cir. Nov. 17, 2022) (citing *Perkins*); *Jackson v. Dist.*

*of Columbia*, 254 F.3d 262, 267-68 (D.C. Cir. 2001) (holding § 1997e(a) does not affect declaratory or injunctive relief to maintain the status quo).

Even were Calvin obligated to exhaust administrative remedies, exhaustion is subject to "one significant qualifier: the remedies must indeed be 'available' to the prisoner." *Ross v. Blake*, 578 U.S. 632, 639, 136 S. Ct. 1850, 195 L. Ed. 2d 117 (2016). "Where prison officials prevent, thwart, or hinder a prisoner's efforts to avail himself of an administrative remedy, they render that remedy 'unavailable' and a court will excuse the prisoner's failure to exhaust." *Gray v. Sorrels*, 818 F. App'x 787, 789 (10th Cir. 2020) (quoting *Little v. Jones*, 607 F.3d 1245, 1250 [10th Cir. 2010]). "In fact, we have stated that district courts are obligated to ensure that any defects in exhaustion were not procured from the action or inaction of prison officials before dismissing a claim for failure to exhaust." *Little*, 607 F.3d at 1250 (internal quotations omitted).

Here, and as alleged in the Complaint, KDOC has refused to grant Calvin access to his attorneys. As a result, KDOC has prevented, thwarted, or hindered Calvin's efforts to avail himself of any administrative remedy. Moreover, Calvin's precarious condition has seen him exclusively in either the prison infirmary or transported to Wesley Medical Center, often too weak to get out of bed, and certainly not without assistance. KDOC has failed to show that the administrative remedy is available in these locations.

Indeed, failure to exhaust administrative remedies under the PLRA is an affirmative defense that KDOC bears the burden of proving. *Conley v. Pryor*, No. 11-3200-DDC-KGS, 2015 WL 413638, at *12 (D. Kan. Jan. 30, 2015), *aff'd*, 627 F. App'x 697 (10th Cir. 2015). In its lengthy filing, the most KDOC can manage is Statement of Fact 3: "Calvin has not filed a grievance appeal with the Secretary of Corrections regarding access to counsel, recent medical care, or familial association. Declaration of Darcie Holthaus, ¶ 5." [DOC 13 at p. 3, ¶ 3]. This conclusory statement

ignores the actual situation – Calvin is weak, in constant, often excruciating pain, has been in and out of the hospital, and often been denied or had limited access to the very people that might have assisted him with any grievance process, even assuming one were truly available. KDOC fails to meet its evidentiary burden.

Finally, KDOC ignores K.A.R. 44-15-201, which allows "the most difficult and complex problems" which cannot "be internally handled under the inmate grievance procedure" to be expedited directly to the Secretary of Corrections. Calvin's undersigned counsel – on his behalf – have repeatedly raised the grievances in the Complaint, including KDOC's starvation, inadequate pain management, and violation of constitutional rights to KDOC's Chief Legal Counsel, Natasha Carter. Ms. Carter has directed Calvin's counsel to communicate *only* with her. Yet despite receiving notice, emails, and calls from counsel, Ms. Carter frequently has failed to respond. Ms. Carter's conduct evidences that KDOC's willingness to receive, consider, and address at the highest levels of KDOC "the most difficult and complex problems" is illusory and counsel's attempts have proven futile. Instead, KDOC appears engaged in an effort to simply run out the clock on Calvin.

### c.   Calvin has not been given access to his attorneys and his attorneys-in-fact

As evidence that Calvin has access to his lawyers, KDOC claims "[f]or starters, Calvin was able to obtain counsel to file the emergency petition to preserve testimony in Johnson County District Court." Response at p. 21. This is a curious argument for KDOC – a party to that lawsuit – to make, given the simple fact that Calvin was not a party. Kiardra Calvin, Calvin's attorney-in-fact, heir, and daughter filed the lawsuit. Calvin's absence actually proves the likelihood of Calvin's success on the merits. Before it could be filed, the Petition had to be verified. K.S.A. 60-227. However, at the time of its preparation, KDOC refused to allow a legal call with Calvin (on

December 14, 2022), and refused to tell counsel where Calvin was located. As a result, counsel could not obtain the requisite Verification from Calvin. Instead, Kiardra Calvin – having standing as his heir – verified the Petition before filing. Too cute in their argument, KDOC supplied the concrete evidence this Court requires to find that KDOC's conduct has prevented Calvin's access to the courts.

Moreover, Calvin's attorneys were able to counsel him during his court-ordered deposition on December 22, 2022. Following that meeting, and further constitutional violations by KDOC, this action was filed. However, the mere filing of this lawsuit is not sufficient to achieve dismissal. If that were so, a constitutional violation for lack of access to the courts could *never* be justiciable, because the mere filing would negate the claim. The Constitution is not so draconian or circular.

Finally, Calvin's Additional Statement of Facts, Nos. 15-16 and the affidavits of Calvin's attorneys-in-fact adequately establish Calvin's likelihood of success on the merits of his claim. KDOC openly admits that it hid Calvin and refused to disclose his location to either Calvin's attorneys-in-fact or attorneys-at-law. It cannot be controverted that KDOC has cancelled visits, refused to allow phone calls, and limited the number of times per week Calvin's large family can visit him to say their goodbyes. This is legally sufficient to meet Calvin's burden in order to receive the relief sought.

**IV.**    **FRCP 27 Permits this Court to Perpetuate Calvin's Testimony**

If a court is "satisfied that perpetuating the testimony may prevent a failure or delay of justice, the court must issue an order" granting the deposition. Fed. R. Civ. P. 27(a)(3). "Among the requirements which must be met before leave will be granted for the taking of pre-complaint depositions under Rule 27 are, first, that the action petitioner contemplates bringing would be cognizable in a court of the United States and second, that a substantial danger exists that the

testimony sought to be preserved by deposition would otherwise become unavailable before the complaint could be filed." *In re Petition of MacCormack*, No. 00-MC-203-KHV-DJW, 2000 WL 526313, at \*1 (D. Kan. Apr. 19, 2000) (quoting *In re Boland,* 79 F.R.D. 665, 667 [D.D.C.1978]).

Here, Calvin and his heirs contemplate bringing various claims for damages, including, but not limited to, a claim under 42 U.S.C. § 1983. Such an action is cognizable in the federal courts. Second, there is a substantial danger that the testimony sought will otherwise be unavailable before the complaint can be filed, because Calvin is dying. Compounding the problem, some of Calvin's potential claims are subject to the Kansas Tort Claims Act, which requires 120-days' advance notice. K.S.A. 12-105b(d). Based on all of the available information, Calvin will not live another 120 days. As a result, ordering his deposition will prevent a failure or delay of justice.

To be clear, Calvin does not seek a "do over" of his deposition. Far from it, Calvin seeks a second deposition covering **only** (1) medical records that KDOC refused (despite repeated requests) to produce prior to his deposition, (2) his care associated with them, and (3) his medical care and treatment by KDOC since his deposition. This is not a second bite at the apple. This is preserving the deposition testimony of a dying man on topics that have never been (and could not have been) covered in a previous deposition. KDOC cannot continue to violate Calvin's constitutional rights, while preventing Calvin from testifying about them simply because he already has been deposed. Facts like these are precisely why Rule 27 exists, indeed tailor-made for application of the Rule.

## CONCLUSION

Calvin requests the Court order the relief requested in the Complaint.

Respectfully submitted,

_/s/ Stephen R. McAllister_
Stephen R. McAllister    KS Bar # 15845
DENTONS
4520 Main Street, Suite 1100
Kansas City, Missouri 64111
Telephone:  (816) 460-2400
Facsimile:  (816) 531-7545
Stephen.McAllister@dentons.com

_/s/ William J. Skepnek_
William J. Skepnek    KS Bar # 10149
THE SKEPNEK LAW FIRM, PA
1 Westwood Road
Lawrence, Kansas 66044
Telephone:  (785) 856-3100
Facsimile:  (785) 856-3099
BSkepnek@SkepnekLaw.com

_/s/ Cheryl A. Pilate_
Cheryl A. Pilate    KS Bar # 14601
MORGAN PILATE, LLC
926 Cherry Street
Kansas City, Missouri 64106
Telephone:  (816) 471-6694
Facsimile:  (816) 472-3516
CPilate@MorganPilate.com

_/s/ Quentin M. Templeton_
Quentin M. Templeton    KS Bar # 26666
FORBES LAW GROUP, LLC
6900 College Blvd., Suite 840
Overland Park, Kansas 66210
Telephone:  (913) 341-8600
Facsimile:  (913) 341-8606
QTempleton@ForbesLawGroup.com

_/s/ Brennan P. Fagan_
Brennan P. Fagan    KS Bar # 20430
FAGAN & EMERT, LLC
730 New Hampshire Street, Suite 210
Lawrence, Kansas 66044
Telephone:  (785) 331-0300
Facsimile:  (785) 331-0303
BFagan@FaganEmert.com

ATTORNEYS FOR MR. CALVIN

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of January, 2023, I electronically filed the foregoing using the CM/ECF system, which will send electronic notice of such filing to all counsel of record.

_/s/ Quentin M. Templeton_
Quentin M. Templeton