IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| JOHN KEITH CALVIN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 5:22-cv-03317-JWL-JPO |
| | ) |
| STATE OF KANSAS, DEPARTMENT OF | ) |
| CORRECTIONS, et al. | ) |
| | ) |
| Defendants. | ) |

### AFFIDAVIT OF RICHARD F. SOSINSKI, M.D.

| | |
|---|---|
| STATE OF KANSAS | ) |
| | )   SS: |
| COUNTY OF DOUGLAS | ) |

     I, Richard F. Sosinski, M.D., being of lawful age and of sound mind, after first being duly sworn on my oath and as an officer of the Court, allege and state as follows:

     1.     I am a licensed Kansas physician and have specialized in Internal Medicine and Palliative care. I have been board certified as an internist since 1979 and I am also board certified in palliative and hospice. I now exclusively work in palliative care and hospice.

     2.     I am familiar with the standard of care for palliative support services and hospice. Though palliative care and hospice have some differences, for the purpose of this affidavit the terms shall be used interchangeably. .

     3.     Palliative care is specialized medical care for people with serious illnesses. It is care that focuses on providing patients with relief from the symptoms, pain, and stress of a serious illness, regardless of their diagnosis. The goal is to improve quality of life for both the patient and their family members.

     4.     Palliative care focuses on physical, psychosocial, and spiritual wellness. Hospice and Palliative Support Services teams include specialized healthcare providers. These providers consist of a physician, nurse practitioner, nurse, chaplain, and social worker. By working with a patient's other providers, palliative care provides an extra layer of support to patients and their families. Palliative care is appropriate at any age and at any stage during a serious illness. It can be provided along with curative treatment. Hospice care is usually reserved for those considered in their last 6 months of life.

**EXHIBIT 1**

5. I have reviewed medical records for John Calvin relating to his care in the Infirmary at the Kansas State Penitentiary in El Dorado Kansas from October 2021 to November 23, 2022; at Wesley Medical Center relating to his care between November 23 and December 16, 2022; and records relating to his care after his return to the Infirmary on December 16 to December 23, 2022.

6. From my review of the records of Mr. Calvin's care in the Infirmary, it is my opinion that his medical and health needs were not timely and appropriately addressed, particularly after the findings of his January 2021 CT scan and the subsequent complaints of pain, bowel, and ureteral dysfunction. By the time he became jaundiced in September 2021, his condition had become critical, and it was clear that he needed medical intervention. Instead, he was treated for a series of conditions that were in the differential diagnosis, including hemorrhoids, lactose allergy, and urinary tract infections, but were all not nearly as likely as the recurrence of his rectal cancer. The failure to react to Mr. Calvin's highly likely recurrence of his rectal cancer, and the aggressive metastasis of that cancer, is perplexing. I am not an oncologist and do not express any opinions concerning particular modalities of cancer care or what an oncologist would do to treat Mr. Calvin's condition, but I am forced to conclude from these records that Mr. Calvin was not provided with a continuity of care and his metastatic cancer was not recognized or reacted to by the Infirmary staff with reasonable alacrity. It has been noted in the medical record that Mr. Calvin, at the time of the treatment of his rectal cancer, and subsequent radiation and chemotherapy, was recommended to have further surgery, including an ileostomy, to increase his chances of cure. The records states that he declined the surgery, because he did not want to manage an ileostomy while incarcerated. This fact greatly increases the probability that any subsequent gastrointestinal symptoms, including constipation, would be attributable to cancer recurrence. A flexible sigmoidoscopy would have been an easy procedure to rule this out. In fact, with the high probability of recurrence of Mr. Calvin's rectal cancer, one wonders why flexible sigmoidoscopy was not part of a routine follow up every 6 to 12 months. My review of Mr. Calvin's care indicates it unlikely that the Infirmary and its staff are capable or qualified to render the care that an extremely complicated case such as this requires.

7. As stated earlier, I have also reviewed nursing records relating to Mr. Calvin's care during the time period after he was transferred back to the infirmary from Wesley Medical Center on December 16, 2022, through December 23, 2022. It is my opinion that those records demonstrate actual inadequacy of the palliative/hospice care in the Infirmary.

8. For example, the growth of Mr. Calvin's cancer has impeded/obstructed his ability to discharge urine from his body. Consequently, while Mr. Calvin was at Wesley, it was deemed necessary for surgical intervention to place nephrostomy tubes into both of Mr. Calvin's kidneys. These nephrostomy tubes are designed to drain into bags outside Mr. Calvin's body. An essential nursing function is to regularly check and change these bags as they fill. An empty or insufficiently full urine bag is a significant finding, as it might suggest blockage or dislodgement of one or both of the tubes. It is apparent that Infirmary nurses did not adequately perform this function after Mr. Calvin returned to the Infirmary.

    a. The nursing notes for December 16 reflect an awareness of the "DD bags" and their purpose, noting they contained "clear amber urine." (12/16 4 p.m., note; page 000067.) On December 17 @ 9 a.m., "600 ml. clear yellow urine" is noted and later that day at 1:30 p.m.,

"400 ml. clear yellow urine" is noted. (12/17 9 a.m., and 1:30 p.m., notes; page 000077.) There are no notes of urine output on December 18. The only note relating to urine drainage on December 19 is at 6 p.m., where the nurse notes "emptied urostomy 325 cc." (12/19 6 p.m., note; page 000099.) The note does not specify whether this is the combined output of both bags or whether it came from a specific bag.

        b.      It is important to note that Mr. Calvin's combined output on December 17 was 1000 ml. while the entire output for December 18 and 19 is just 325 cc. (cc and ml are equivalent). If this is true, the patency of the lines should have been checked and the matter should have been reported to the physician.

        c.      On December 20 the urinary output drops again to just 200 cc. (12/20, 3 p.m., note; page 000110.) At 5 a.m., on December 21, the urinary output is noted as 400 cc. (12/20, 5 a.m., note; page 000125.) Again, this is markedly diminished from the output on December 17.

        d.      That same day the nurse notes "[Mr. Calvin] points out that his left nephrostomy tube is not draining currently as well." (12/21 note; page 000127.) At this point it would be necessary for the nurse to inspect the nephrostomy tubing to determine whether the line is connected and patent. Instead, she simply notes a further drop in his urine output to 100 cc, this time specifying that it came from the right side, while noting "Left continues to be empty." (12/21 3 p.m., note; page 000131.) The nurse's use of the word "continues" denotes that she has been aware of this as an ongoing problem. It is troubling to me that Mr. Calvin was forced to call the lack of drainage from his left nephrostomy tube to the nurse's attention. The records show that the physician was not notified of the lack of drainage from the left nephrostomy tube until December 22, when a nursing note states: "-850- Dr. Harrod notified that L nephrostomy tube is currently not draining well. Per Dr. Harrod, continue to monitor nephrostomy output and notify him if there is still no output tomorrow." (12/22 8:50 a.m., note; page 000144.) At the same time the nurse charted the conversation with Dr. Harrod, she notes that she took 290 ml from the right bag, but the left bag was empty. (12/22 8:50 a.m., note; page 000147.)

        e.      This reaction by both the doctor and the nurse is very disturbing. It appears from the records that Mr. Calvin's left nephrostomy tube had not been draining for 5 days, since December 17, and yet neither the doctor nor the nurse has done anything to investigate the cause. At midnight on December 23, 200 cc is "emptied from the bag," but the note does not differentiate which bag. (12/23 12 a.m., note; page 000160.)

        f.      It was not until that afternoon, December 23 at 1:30 p.m., that the cause of the lack of drainage was discovered. While changing Mr. Calvin's dressings the nurse found that the left nephrostomy tube was completely disconnected and coiled on the outside of Mr. Calvin's body. "L flank: Old dressing removed to reveal the nephrostomy tube completely DC'd. No active drainage/bleeding, redness, warmth or swelling visualized to this RN. Dr. Harrod. Harbes UM reports she will notify the hospital and notify the RN of any new orders." (12/23 1:30 p.m., note; page 000164.) At 2 p.m., Mr. Calvin was ordered returned to Wesley for nephrostomy tube replacement. (12/23 2 p.m., note; page 000164.)

3

9.      Moreover, I am deeply troubled by KDOC's failure to provide essential elements of hospice care in Mr. Calvin's case. The records from Wesley Medical Center state that the flexible sigmoidoscopy that had been finally performed showed a rectal stricture, such that a full colonoscopy was unable to be performed. The assessment of the surgical team was that Mr. Calvin should have a diverting colonoscopy for palliation. In fact, he underwent surgery, but the colonoscopy could not be accomplished because of the copious spread of the cancer within his abdomen. Therefore, the combination of partial or impending biliary and rectal obstructions, along with advanced pain from bilateral ureteral obstruction and carcinomatosis, along with his marked cachexia places this as a complicated hospice and palliative case. The standard of care in my community, and I believe in most communities, regarding such a case would include referral to certified and experienced hospice care physicians and nurses.

   a. The medication plan given to Mr. Calvin, as suggested by the Wesley hospital physicians, consists of oral hydromorphone, IV morphine and other oral opioids. It also includes octreotide, which is important in the symptom management of terminal bowel obstruction, and MiraLAX, to avoid constipation. These drugs have been obtained and administered, and the morphine dose has been increased one time, according to the records. There are times when Mr. Calvin's pain appears to be controlled, and there are times when, according to the records and statements of his family, that it is not. I have read a statement from one of those taking care of Mr. Calvin that there is hesitation concerning an increase in the opioid dosing because of fear of oversedation and constipation. There does not appear to be much sedation reflected in the medical notes, and this side effect could be easily managed by an experienced hospice care team. For instance, rotation to another opioid could be considered, or an addition of a mild stimulant. I have concerns whether a PCA pump, if needed, would be available at the infirmary. Constipation could be alleviated by an appropriate prophylactic bowel prep. It is curious that Mr. Calvin is not on senna, which is standard in patients taking high-dose opioids.

   b. Nutrition and weight loss are always complex in a case of this sort. No doubt Mr. Calvin's cachexia (marked loss of weight and muscle) is to a large extent due to his advanced cancer and is unlikely to be reversed. However, nutritional needs being met in order to support his daily functioning is a reasonable goal. This would include consultation by a nutritionist, determination of those foods that Mr. Calvin could tolerate and seem appealing to him, and dietary supplements such as Ensure (which he is receiving). I am not convinced that these kinds of foods have been available to him while in prison.

   c. Hospice care is holistic, by its very nature. It includes both of the above, but also requires spiritual care, social work care and counseling, nursing assistance for activities of daily living provided by those trained in end-of-life care. Absolutely essential is the availability and presence of family to the dying patient. Afterall, dying at home rather than in a hospital was at the very foundation of hospice care. Once a week availability of family does not, to me, appear to be enough. I have read in the record where daily visits will be allowed

4

"when it is time". Well, in my opinion, Mr. Calvin has weeks to live and therefore, it is time.

d. Mr. Calvin, given his present condition, can be expected to experience further complications of his disease. Examples include progression to complete bowel obstruction and loss of the oral route of pain medicine administration, pain that is refractory to his present medications, and agitated terminal delirium. I have concerns about the capabilities of the current facility to manage these problems, and therefore I worry that he may suffer needlessly.

10. It is my opinion to a reasonable degree of medical certainty, based upon my education, training, and experience, that Mr. Calvin has not received medically necessary palliative/hospice care at the Infirmary, and that it cannot reasonably be expected that he will receive adequate care in the future. It is clear that Mr. Calvin cannot be expected to live much longer and it is medically necessary that he be transferred to a palliative care unit near his family. St. Luke's Hospice House; Midland Care in Topeka; and Olathe Medical Center are three that would be appropriate. Mr. Calvin has weeks or perhaps a month to live, and it is critical that he and his family be together during this time, and that his pain and symptom control is managed by medical personnel that are experienced and trained in hospice and palliative care.

11. It is also my opinion, to a reasonable degree of medical certainty, based upon my education, training, and experience, that the KDOC's treatment of Mr. Calvin evidences indifference to his medical needs and will unnecessarily hasten a very painful death.

12. I concur with the conclusion reached by Wesley in its December 13, 2022, note that the prison infirmary cannot appropriately handle this very complex palliative care case.

13. If called as a witness, I would testify in a manner consistent with the averments set forth above.

FURTHER AFFIANT SAITH NAUGHT.

_____
Richard F. Sosinski, M.D.

Subscribed and sworn to before me this 10th day of January 2023.

Susan Pearson-Skepnek
Notary Public   State of Kansas
My Appt. Exp. 12-10-26

_____
NOTARY PUBLIC

5